In re BACHRACH CLOTHING,
INC., Debtor.

Bachrach Clothing, Inc., Plaintiff,

v.

Edgar H. Bachrach, et al., Defendants.

Bankruptcy No. 06–06525.
Adversary No. 08–00726.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 10, 2012.

Robert M. Fishman, Mark L. Radtke, Peter J. Roberts, Shaw Fishman Glantz & Towbin LLC, Chicago, IL, George J. Spathis, Horwood Marcus & Berk Chtd., Chicago, IL, for Plaintiff.

R. Scott Alsterda, Patrick F. Ross, Lindsay E. Wilson Gowin, Michael Philippi, Ethan E. Trull, Amy M. Gardner, Ungaretti & Harris LLP, Chicago, IL, for Defendants.

Lawrence C. Gottlieb, Jeffrey L. Cohen, Cooley LLP, New York, NY, Jason Frye,

Neal Gerber Eisenberg, Chicago, IL, Attorneys for the Official Creditors Committee.

Wendy Epstein, Kirkland & Ellis, Chicago, IL, Attorney for Sun.

### Memorandum Opinion

PAMELA S. HOLLIS, Bankruptcy Judge.

### Introduction

Debtor BCI brought this action to avoid transfers made to its former owners. After five days of trial and review of thousands of pages of additional evidence submitted, including financial treatises, expert reports and depositions, the court enters judgment in favor of Defendants on all counts.

### Parties

Plaintiff in this adversary proceeding is Chapter 11 debtor, Bachrach Clothing, Inc. ("BCI" or "Bachrach"). Defendants are Edgar H. Bachrach ("Ed"), his sisters, Sally B. Robinson and Barbara B. James (all three together, the "Sellers"), and Barsaled, LLC ("Barsaled," and together with the Sellers, "Bachrachs" or "Defendants"). Sellers are Barsaled's only members.

### Jurisdiction and Authority to Enter Final Judgment

The complaint filed in this adversary proceeding consists of fifteen counts ("Complaint"). All but three of the counts allege violations of federal bankruptcy and state fraudulent conveyance laws, citing 11 U.S.C. §§ 544(b), 548 and 550, and 740 ILCS 160/5 and 160/6. The fraudulent conveyance counts do not plead state and federal claims distinctively, presumably because the state and federal statutes are substantially similar. Additionally, Count 13 contends that Defendants, former board members of BCI, breached fiduciary duties of good faith, fair dealing, honesty and loyalty in selling BCI. Count 14 seeks to disallow Defendants' proofs of claim, citing 11 U.S.C. § 502(d) of the Bankruptcy Code, which blocks payment on a creditor's claim until that creditor returns property subject to avoidance, including fraudulent transfers. Count 15 relies on 11 U.S.C. § 510(c) of the Bankruptcy Code to subordinate claims and liens of Defendants to the extent they engaged in inequitable conduct harmful to BCI's creditors.

■ Unremarkably, this court has subject matter jurisdiction to hear debtor's Complaint pursuant to 28 U.S.C. § 1334 and § 157. Slightly more controversial is whether this court has the authority to enter a *final* judgment on all counts in light of the United States Supreme Court's decision in *Stern v. Marshall*, — U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). However, *Stern* does not remove this court's authority to render a final judgment. Here, resolution of nearly all of the contested issues was necessary to adjudicate Defendants' proofs of claim. Additionally, the parties consented to a final judgment by this court.

Given the extensive discussion of *Stern* in hundreds of decisions since its release last year, a protracted review of its facts will be skipped. At issue was a counterclaim filed by the debtor in response to a creditor's defamation action. The creditor elected to file the defamation claim in the bankruptcy court. The Supreme Court held that the creditor consented to the bankruptcy court's entry of a final judgment on his defamation claim, but the creditor did not consent to a final judgment on the debtor's counterclaim for tortious interference. The Court found that the counterclaim was not necessary to resolving the creditor's proof of claim and was based on state common law claims that could have been asserted by the debtor independent of the bankruptcy.

Title 28 U.S.C. § 157(b)(2)(C) provides that estate counterclaims brought in re-

sponse to persons filing claims against the estate are "core" proceedings. If a matter is "core," the bankruptcy judge is authorized to issue final orders instead of preparing proposed findings of fact and conclusions of law for review by an Article III court. In *Stern*, the Supreme Court decided this statute was too broad. By classifying counterclaims—regardless of whether they stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process—as "core proceedings," Congress went too far. Accordingly, the Court held:

> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

131 S.Ct. at 2620. The *Stern* court did not strike down all of § 157, and emphasized that its decision was a narrow one. *Id.*

The proceeding before this court does not involve common law based counterclaims. Instead the debtor seeks to invalidate Defendants' sale of BCI as fraudulent. Section 157(b)(2)(H) declares fraudulent transfer actions to be core proceedings. Until *Stern*, this section unquestionably authorized entry of final judgments by the bankruptcy court. A wrinkle arises, however, since the Supreme Court previously determined that fraudulent transfer actions were based on common law, independent of bankruptcy proceedings. "There is no dispute that

actions to recover preferential or fraudulent transfers were often brought at law in late 18th-century England." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 43, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). The *Stern* majority's comment that its debtor's counterclaim should be treated the same as the fraudulent transfer claim in *Granfinanciera*[1] raises worries about the bankruptcy judge's authority to issue a final judgment on fraudulent transfer claims. *See* Douglas G. Baird, *Blue Collar Constitutional Law*, 86 Am. Bankr. L.J. 3, 8–9 (Winter, 2012); Ralph Brubaker, *A "Summary" Statutory and Constitutional Theory of Bankruptcy Judges' Core Jurisdiction After Stern v. Marshall*, 86 Am. Bankr. L.J. 121, 183 (Winter, 2012). As Professor Brubaker concluded:

> [T]he rationale of the *Granfinanciera* decision itself clearly called into doubt the constitutionality of bankruptcy judges' core jurisdiction over preference and fraudulent conveyance suits. After *Stern v. Marshall*, the conclusion seems inescapable that such core jurisdiction to enter final judgment—expressly conferred by Judicial Code § 157(b)(2)(F) & (H)—is unconstitutional. Without the consent of the litigants, a bankruptcy judge can do no more than hear the action and submit proposed findings of fact and conclusions to the district court.

*Id.* at 183.

Before *Stern*, the filing of a proof of claim by a fraudulent transfer defendant generally permitted the bankruptcy court to enter a final judgment in the avoidance action. The holdings in *Granfinanciera* and *Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) supported this assumption. Neither of those decisions required analysis as to how much of the claim that was independent of the

---

1. "We see no reason to treat Vickie's counterclaim any differently from the fraudulent conveyance action in *Granfinanciera*." *Stern*, 131 S.Ct. at 2618.

bankruptcy needed to be resolved in order to determine a creditor's proof of claim. For example, in *Langenkamp* the Supreme Court held that the mere filing of a proof of claim subjected the creditor to bankruptcy court authority—without any detailed analysis of the overlap of the creditor's proof of claim and debtor's avoidance action.

> In *Granfinanciera* we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power. 492 U.S. at 58–59, and n. 14, 109 S.Ct. at 2799–2800, and n. 14 (citing *Katchen, supra*, 382 U.S. at 336, 86 S.Ct. at 476). If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. *Ibid.* In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction. Granfinanciera, supra*, 492 U.S. at 57–58, 109 S.Ct. at 2798–2799. As such, there is no Seventh Amendment right to a jury trial. If a party does *not* submit a claim against the bankruptcy estate, however, the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances the preference defendant is entitled to a jury trial.

*Langenkamp*, 498 U.S. at 44–45, 111 S.Ct. 330.

So while it was presumed that the filing of a proof of claim authorized the bankruptcy judge to enter final judgments on avoidance actions brought against the fil-

ing creditor, *Stern* spoils that assumption. "*Stern* held that the bankruptcy court could not constitutionally decide the debtor's counterclaim against a creditor, despite the fact that the creditor had not only filed a proof of claim, but also had forfeited any objection to the bankruptcy court deciding his *own* common law claim against the debtor." [2] In *Stern*, the filing of a claim was not enough:

> It was in that sense that the Court stated that "he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure." *Id.*, at 333, n. 9, 86 S.Ct. 467. In *Katchen* one of those consequences was resolution of the preference issue as part of the process of allowing or disallowing claims, and accordingly there was no basis for the creditor to insist that the issue be resolved in an Article III court. *See id.*, at 334, 86 S.Ct. 467. Indeed, the *Katchen* Court expressly noted that it "intimate[d] no opinion concerning whether" the bankruptcy referee would have had "summary jurisdiction to adjudicate a demand by the [bankruptcy] trustee for affirmative relief, all of the substantial factual and legal bases for which ha[d] not been disposed of in passing on objections to the [creditor's proof of] claim." *Id.*, at 333, n. 9, 86 S.Ct. 467.

Our *per curiam* opinion in *Langenkamp* is to the same effect. We explained there that a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because *then* "the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship." 498 U.S. at 44, 111 S.Ct. 330. If, in contrast, the creditor has not filed a proof of claim,

---

**2.** Eric G. Behrens, Stern v. Marshall: *The Supreme Court's Continuing Erosion of Bank-* *ruptcy Court Jurisdiction and Article I Courts,* 85 Am. Bankr. L.J. 387, 415 (Fall, 2011).

the trustee's preference action does *not* "become[ ] part of the claims-allowance process" subject to resolution by the bankruptcy court. *Ibid.; see id.*, at 45, 111 S.Ct. 330.

... There was some overlap between Vickie's counterclaim and Pierce's defamation claim that led the courts below to conclude that the counterclaim was compulsory.... But there was never any reason to believe that the process of adjudicating Pierce's proof of claim would ***necessarily resolve*** Vickie's counterclaim....

....

... Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.

*Stern*, 131 S.Ct. at 2616–18 (emphasis added).

The only way to harmonize *Stern* with earlier decisions like *Granfinanciera* and *Langenkamp* is to conclude that the filing of a proof of claim does not automatically authorize the bankruptcy court to enter a final judgment against that creditor. Instead, the bankruptcy judge's authority hinges on an analysis of whether resolution of the debtor's independent claim *is necessary* to determine the creditor's proof of claim.[3] Such a test was employed by the Seventh Circuit in *In re Ortiz*, 665 F.3d 906, 914–15 (7th Cir.2011). This has led one commentator to conclude: "Without a perfect match-up of issues, such that deciding the proof of claim necessarily re-

solves the debtor's claim, and vice versa, *Stern* would indicate that a bankruptcy judge cannot decide any state law or common issue against a third party." [4]

After *Stern*, courts disagreed on whether bankruptcy judges could enter final judgments in fraudulent conveyance actions, absent the consent of the parties. Contrast for example, *In re Menotte v. United States (In re Custom Contractors, LLC)*, 462 B.R. 901 (Bankr.S.D.Fla.2011); *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 645–46 (Bankr.D.Del.2012) (yes)— with *Heller Ehrman LLP v. Arnold & Porter, LLP (In re Heller Ehrman LLP)*, 464 B.R. 348 (N.D.Cal.2011); *In re Teleservices Group, Inc.*, 456 B.R. 318 (Bankr. W.D.Mich.2011); *Paloian v. Am. Express Co. (In re Canopy Fin., Inc.)*, 464 B.R. 770 (N.D.Ill.2011) (no).

In reviewing the twelve fraudulent transfer counts brought in this case, this court concludes it has the power to enter final orders on those counts, since they were integral and necessary to resolving Defendants' proofs of claim. All of Defendants' proofs of claim sought payment on obligations arising solely from the sale of BCI. BCI's adversary complaint tries to avoid that sale and the transfers of property that resulted from it. Ed, as collateral agent for himself and his sisters, filed secured Claim 243–1 on October 5, 2006, in the amount of $4,172,054.79 plus expenses. This claim represented Ed and his sisters' lien on BCI's collateral to secure a note issued by BCHC, the purchaser of BCI.[5]

---

3. Ralph Brubaker, *A "Summary" Statutory and Constitutional Theory of Bankruptcy Judges' Core Jurisdiction After Stern v. Marshall*, 86 Am. Bankr. L.J. 121, 184 (Winter, 2012) ("It appears that the only durable justification for non-Article III adjudication of the preference actions in *Katchen* and *Langenkamp* ... is the Court's 'necessity' rationale: as objections and counterclaims to creditors' claims against the estate, adjudication of the

preferences was necessarily part and parcel of the summary process of adjudicating allowance of the creditors' claims against the estate.").

4. Behrens, *supra* note 2, at 426–27.

5. Ed as Collateral Agent also filed Claim 334–1 for administrative expenses.

The remaining defendant in this proceeding, Barsaled LLC, filed unsecured Claim 245–1 in the amount of $168,022.58, which represented rent due from BCI on real property transferred to Barsaled on or about the same time as the sale of BCI to BCHC. The Complaint alleges, and the court agrees, that rent to Barsaled was in connection with the Stock Purchase Agreement. Count one of the Complaint seeks to avoid all obligations created by the Stock Purchase Agreement. If debtor prevailed on this one count alone, Defendants' proofs of claim would necessarily be disallowed. The remaining fraudulent conveyance counts simply divide up the type and nature of transfers going to each defendant as a result of the sale. Disallowance of Defendants' claims would necessarily follow a judgment for the Debtor on all the fraudulent conveyance counts. This is mandated by Bankruptcy Code § 502(d) which denies payment on a claim if the creditor received and failed to return voidable transfers.[6] Indeed, that provision anchors Count 14, which sought disallowance of the claims of Ed and his sisters (Claims 241–1 and 334–1) because of the alleged fraudulent conveyances. Count 14 incorporates the first 146 allegations of the Complaint, demonstrating the inseparable overlap between this proceeding and the claims allowance process. As a result, resolution of BCI's claims in this proceeding is necessary to determine Defendants' proofs of claim.

Count 15 seeks to equitably subordinate Ed and his sisters' proofs of claim under § 510(c) of the Bankruptcy Code. Again, this is nothing more than claims resolution added as a count to this adversary proceeding. BCI's claim for equitable subordination depends on the existence of Defendants' claims in the first instance. Accordingly, this court retains authority to issue a final order on Count 15, which requests subordination of claims. *See* concurring post-*Stern* decisions: *Burtch v. Huston (In re USDigital, Inc.)*, 461 B.R. 276 (Bankr.D.Del.2011) and *Direct Response Media*, 466 B.R. at 645–46.

Finally, Count 13 alleges breach of fiduciary duty and incorporates nearly all of the fact allegations of the Complaint's other counts, again demonstrating an overlap with the claims resolution process. Generally, directors owe fiduciary duties only to their shareholders. However, when a company is operating in the zone of insolvency, Illinois law expands that duty to the company's creditors. *See Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, No. 97C7934, 2000 WL 28266, at *4 (N.D.Ill. Jan. 12, 2000). If BCI was not insolvent near the time of the sale, this count falls away. If this court were to allow Defendants' proofs of claim on the basis that there was no fraudulent conveyance because debtor was solvent, there is really nothing more for any Article III court to determine on Count 13. In considering a similar situation in *Stern*, the majority observed that the bankruptcy judge (or referee) would have power to finally decide the avoidance action:

> Although the creditor in *Katchen* objected that the preference issue should be resolved through a "plenary suit" in an Article III court, this Court concluded that summary adjudication in bankruptcy was appropriate, because it was not possible for the referee to rule on the creditor's proof of claim without first

---

**6.** The court recognizes § 502(d) can prevent payment on a proof of claim that was completely unrelated to a debtors' avoidance action, allowing an argument that resolution of the proof of claim does not overlap with the avoidance action. However, that is not the case here. Deciding Defendants' proofs of claim directly affects resolution of this adversary proceeding and vice versa.

resolving the voidable preference issue. 382 U.S. at 329–330, 332–333, and n. 9, 334, 86 S.Ct. 467. There was no question that the bankruptcy referee could decide whether there had been a voidable preference in determining whether and to what extent to allow the creditor's claim. Once the referee did that, "nothing remains for adjudication in a plenary suit"; such a suit "would be a meaningless gesture." *Id.,* at 334, 86 S.Ct. 467. The plenary proceeding the creditor sought could be brought into the bankruptcy court because "the same issue [arose] as part of the process of allowance and disallowance of claims." *Id.,* at 336, 86 S.Ct. 467.

*Stern,* 131 S.Ct. at 2616.

Because of the close relationship between the breach of fiduciary duty count and the claims resolution process, this court does have authority to enter a final order on Count 13. *Stern* only held that the bankruptcy court lacked power to enter a final judgment on a state or common law claim not derived solely from the bankruptcy "that is not resolved in the process of ruling on a creditor's proof of claim." 131 S.Ct. at 2620. In *Stern,* unlike here, "[t]here thus was never reason to believe that the process of ruling on Pierce's proof of claim would necessarily result in the resolution of Vickie's counterclaim." *Id.* at 2617–18.

In this case, *Stern* will be applied narrowly, in line with its majority opinion which emphasized:

> We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a "narrow" one.
>
> . . . .
>
> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

*Stern,* 131 S.Ct. at 2620.

After this court presided over a lengthy trial, post-trial briefs were filed, and the matter was taken under advisement, Ed and his sisters (but not Barsaled) were given leave to withdraw their proofs of claim on or about February 20, 2011. *Order on Plaintiff's Motion to Voluntarily Dismiss Adversary Proceeding No. 09–00225 (Dkt. 56).* The withdrawal of claims occurred months before the *Stern* decision. No language specifically referred to the effect of the claims withdrawal on the bankruptcy court's power to finally adjudicate this proceeding. Presumably, this is because the parties consented to the court's power, and *Stern* had not yet surfaced to create an uproar.

Defendants won this case, so it is unlikely they will ever assert that withdrawal of their claims voided the bankruptcy judge's power to render a final decision. However, if debtor tries to avert its loss by such a belated argument, it should fail. Two pre-*Stern* decisions are instructive. *EXDS, Inc. v. RK Elec., Inc. (In re EXDS, Inc.),* 301 B.R. 436 (Bankr.D.Del.2003) involved an attempt by a defendant to withdraw a proof of claim in order to demand a trial by jury. This court agrees with that court's statements on pp. 440–41:

> Given the clear directive of *Langenkamp,* I do not believe it makes any difference on the jury trial issue whether I authorize RK to withdraw its proof of claim. At the time of the filing of the

adversary complaint, RK was subject to the jurisdiction of this court where there is no right to a jury trial. In the words of *Langenkamp*, RK submitted itself to the "claims-allowance process" of the equity court. Stated differently, in the words of the *Travellers* opinion, RK lost its right to a jury trial because it elected to participate in the equity court proceeding. Given the unequivocal language of *Langenkamp* and *Travellers* as to the effect of filing a proof of claim, I do not believe that a creditor can, for strategic reasons, reverse the result it triggered by filing a proof of claim by later withdrawing the claim....

In an analogous situation, the court in *In re Sea Island Cotton Trading, Inc.*, 2000 WL 33952877, at *2–3 (Bankr. S.D.Ga. July 25, 2000) found that "[d]efendants submitted themselves to the jurisdiction of this court by filing proofs of claim in the bankruptcy case. The subsequent assignment of the claim does not divest this court of jurisdiction over Defendants." Another analogous situation is found in *In re Barrett Refining Corp.*, 221 B.R. 795 (Bankr.W.D.Okla. 1998). There the court held that the State of Mississippi relinquished any right of sovereign immunity by filing a proof of claim even where that proof of claim stated that the State "reserved" state sovereign immunity.

In the matter before me, as in the *Langenkamp* case, the proof of claim was filed before the avoidance action was commenced. That fact pattern suggests a result similar to that involving federal jurisdiction based on diversity. Federal diversity jurisdiction depends on the citizenship of the parties at the time suit is filed. *See, e.g., Anderson v. Watt,* 138 U.S. 694, 702–03, 11 S.Ct. 449, 34 L.Ed. 1078 (1891) ("And the [jurisdictional] inquiry is determined by the condition of the parties at the commencement of the suit."); *see also Minneapolis & St. Louis R.R. Co. v. Peoria & Pekin Union R.R. Co.,* 270 U.S. 580, 586, 46 S.Ct. 402, 70 L.Ed. 743 (1926) ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought.").

*Id.* (alternations in original).

Following this decision was *Enron Corp. v. Citigroup, Inc. (In re Enron Corp.),* 349 B.R. 108 (Bankr.S.D.N.Y.2006), where the court held that disposition of a proof of claim did not affect the bankruptcy judge's power to finally adjudicate matters:

> The disposition of a claim, alone, does not nullify the consequences of a creditor's invocation of jurisdiction premised upon such claim. *See EXDS, Inc. v. RK Electric, Inc. (In re EXDS, Inc.),* 301 B.R. 436, 439–41 (Bankr.D.Del.2003) (concluding that "a creditor [cannot], for strategic reasons, reverse the result it triggered by filing a proof of claim by later withdrawing the claim"); *The Academy, Inc. v. James, Hoyer, Newcomer, & Smiljanich, P.A., et al. (In re The Academy, Inc.),* 289 B.R. 230, 234–35 (Bankr.M.D.Fla.) ("The fact that [the defendants in adversary proceeding] no longer wish to assert claims against the [debtor] should not impact in any way the court's jurisdiction over them for the purpose of the [debtor]'s claims against them.").

*Id.* at 114–15 n. 2.

■ Accordingly, once the bankruptcy court's power is properly invoked and the case tried to a conclusion, no party may challenge the outcome by relying on a subsequent claim withdrawal. Any other result invites gamesmanship and a waste of resources.

Even if withdrawal of some claims could affect the bankruptcy court's power,[7] the

---

**7.** As mentioned previously, defendant Bar-

saled did not withdraw its proof of claim in

parties consented to this court's authority to enter a final judgment. Since the issue in *Stern* only involved the bankruptcy judge's authorization to issue a final judgment, and *not* subject matter jurisdiction to hear the case, the parties may agree to a final adjudication by the bankruptcy court. That was made plain in *Stern* when the majority held that the creditor who brought his defamation claim to the bankruptcy court, and voluntarily litigated it there, waived his right to trial before an Article III court:

> We agree with Vickie that Pierce not only could but did consent to the Bankruptcy Court's resolution of his defamation claim. . . .
>
> Indeed, Pierce apparently did not object to any court that § 157(b)(5) prohibited the Bankruptcy Court from resolving his defamation claim until over two years—and several adverse discovery rulings—after he filed that claim. . . .
>
> Given Pierce's course of conduct before the Bankruptcy Court, we conclude that he consented to that court's resolution of his defamation claim (and forfeited any argument to the contrary). We have recognized "the value of waiver and forfeiture rules" in "complex" cases, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487–488, n. 6, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), and this case is no exception. In such cases, as here, the consequences of "a litigant . . . 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor," *Puckett v. United States*, 556 U.S. 129, [134], 129 S.Ct. 1423, 1428–29, 173 L.Ed.2d 266 (2009) (some internal quotation marks omitted)—can be particularly severe. If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation, then he should have said so—and

said so promptly. *See United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it' " (quoting *Yakus v. United States*, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944))). Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there. We will not consider his claim to the contrary, now that he is sad.

*Stern*, 131 S.Ct. at 2607–08.

Several post-*Stern* cases hold that parties may consent to final adjudication by the bankruptcy court and forfeit or waive any right to a final adjudication by an Article III court. *See In re Olde Prairie Block Owner, LLC*, 457 B.R. 692 (Bankr. N.D.Ill.2011); *Hawaii Nat'l Bancshares, Inc. v. Sunra Coffee LLC (In re Sunra Coffee LLC)*, No. 09–01909, 2011 WL 4963155, 2011 Bankr.LEXIS 4047 (Bankr. D.Haw. Oct. 18, 2011). Moreover, this consent may be implied by the conduct of the parties. *See In re Custom Contractors*, 462 B.R. at 909; *Ardi Ltd. P'ship v. The Buncher Company (In re River Entm't Co.)*, 467 B.R. 808 (Bankr.W.D.Pa. 2012). All of these cases agree that parties who litigate before the bankruptcy court through lengthy stages, without objection, will be deemed to have consented to a final judgment by the bankruptcy court.

■ BCI elected to file its case before the bankruptcy court and alleged in paragraph 16 of the Complaint: "This adversary proceeding constitutes a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b)." All

the February 2011 order.

Defendants admitted to this allegation. Additionally, in the jointly prepared Stipulations of Fact for Trial, the parties again agreed that: "This adversary proceeding constitutes a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b)." (¶ 15). As held in *Mercury Companies, Inc. v. FNF Sec. Acquisition, Inc.*, 460 B.R. 778 (D.Colo.2011):

> "[A]n allegation that the proceeding is core serves as an express consent for the bankruptcy court to treat that proceeding as core and enter a final order in that proceeding," *In re C.W. Mining Co.*, No. 2:09CV417DAK, 2009 U.S. Dist. LEXIS 115705, 2009 WL 4906702, at *2 (D.Utah Dec. 11, 2009). The parties' admissions in their pleadings that the Adversary Proceeding was a core proceeding constituted consent to the authority of the Bankruptcy Court to enter orders and judgment in the proceeding. ... Here, not only did the parties admit in their responsive pleadings that the action was a core proceeding, but neither party made any allegation that the action or any claim therein was noncore, and neither party made any mention that they did not consent to the authority of the Bankruptcy Court to enter orders and judgment (as they were required to do under Federal Rule of Bankruptcy Procedure 7012(b) if they believed it was a non-core proceeding). This also constituted consent to the authority of the Bankruptcy Court to enter orders and judgment in the Adversary Proceeding. *See Citizens Concerned for Separation of Church & State v. City & County of Denver*, 628 F.2d 1289, 1293 (10th Cir.1980) (observing that where an answer fails to deny jurisdictional allegations, the allegations are properly deemed admitted).

Finally, the Adversary Proceeding was filed on January 27, 2010, and Defendants waited nearly 19 months, until August 15, 2011, to challenge the authority of the Bankruptcy Judge to enter orders and judgment in the Adversary Proceeding. In the meantime, not only did Defendants consent in their responsive pleadings to the authority of the Bankruptcy Court to enter orders and judgment, but they also heavily litigated the action in the Bankruptcy Court, filing a witness and exhibit list (ECF No. 46), deposition notices (AP ECF No. 59, 64–66, 105, 106, 111), expert disclosures (AP ECF No. 97), a motion for partial summary judgment (AP ECF No. 90), a motion for summary judgment (AP ECF No. 124), and a motion *in limine* (AP ECF No. 125). In so doing, Defendants' impliedly consented to the authority of the Bankruptcy Court to enter orders and judgment in the Adversary Proceeding. *See In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 96 (2d Cir.2005) ("[L]ienors, by litigating their maritime liens before the bankruptcy court, consented to the bankruptcy court's equitable jurisdiction to adjudicate and extinguish their liens....."); *In re Kaiser Steel Corp.*, 95 B.R. 782, 788 (Bankr. D.Colo.1989) ("[C]onsent under [28 U.S.C. § ] 157(c)(2) ... may be implied from a timely failure to object to the Bankruptcy Court's jurisdiction; or it may be implied from any act which indicates a willingness to have the Bankruptcy Court determine a claim or interest.").

*Id.* at 781–82.

■ Because the parties in this proceeding admitted that the matters to be decided here are core, they expressly consented to a final adjudication by this court. Consent may also be implied. At no time before, during, or after the trial of this case did any party object to or question the power of this court to finally decide the matters before it. The parties have had an opportunity to digest *Stern*'s holding

for over a year and have yet to raise any questions regarding this court's authority. The opportunity is now foreclosed.

### Findings of Fact [8]—Rule 7052, Federal Rules of Bankruptcy Procedure

#### 1. Events Leading up to Sale of Debtor

BCI, or "Bachrach," was a mall-based retailer of men's apparel. Until 2005, BCI was owned and operated by the Bachrach family. Ed's great grandfather, Henry Bachrach, founded the business in 1877, after selling civilian suits to returning Civil War soldiers for twenty five cents. Henry's original Decatur, Illinois store was called "Cheap Charley". The business grew to a peak of 82 stores in the mid–1990s. Until the business was sold in 2005, there were only four presidents: founder Henry; his son Edgar, Edgar's son Henry and Henry's son—Ed Bachrach, a defendant in this action. Before the 2005 sale, one hundred percent of the business' stock was owned by trusts in favor of Ed and his two sisters. Ed, his sisters, and brother-in-law Ronald James, who is married to sister Barbara James, sat on BCI's board of directors, and constituted BCI's entire board of directors up until the sale (the "Directors").

Ed Bachrach's trust held the majority of BCI's shares. Ed worked in the family business starting at the age of seven. He received an accounting degree from Northwestern University in 1970, and returned to Bachrach as a controller in 1976, following a stint in the Army and four years as a staff accountant with Ernst & Whinney. Ed became a licensed CPA in 1971.

Ed reported to his father Henry when he started as controller in 1976. Ed became President of BCI in 1979 and held that position until the company was sold in 2005. During Ed's time with the company from 1976 up to 2005, he was intimately familiar with its financial situation. During most of those years, BCI was profitable. BCI's assets never exceeded its liabilities, and the company was always able to pay its debts as they became due. Not a single vendor refused favorable credit terms because of a concern that BCI could not pay its debts, nor was the company ever sued for failing to pay its debts. The company never experienced negative working capital nor did anyone express a concern that its working capital was too small. Also during the years that Ed ran the company, BCI's operations were financed primarily by the positive cash flow generated by the company. "We always carried

---

**8.** The court took under advisement Defendants' request to admit as evidence for truth of the matter: DX 22, 29, 54 and 60 (mostly pre-bankruptcy statements of Sun employees who became BCI directors or officers) offered as party admissions; DX 43, 47, 50, 51, 60, 138, 209 and 210 (statements by Sun employees alleged to be debtor's agent); McGladrey & Pullen work papers DX 206 and 207 and Prior Witness Statements DX 46, 187 and 209, alleged admissible under Rule 801(d)(1). Plaintiff objected primarily on hearsay grounds. Defendants' total exhibits consisted of over ten thousand pages, plus depositions and trial transcripts of many more thousands of pages, most of which were admitted and considered. The court did not rely on the truth of the matter of any of these contested exhibits to issue findings of fact or other rul-

ings in this opinion, so their admission will be denied as cumulative. The question presented regarding admission was not an easy one. BCI supported its objection that these were not party admissions with ample case law holding that the estate was separate from the pre-bankruptcy debtor. However, as indicated in this opinion, Sun appeared to be controlling the estate at various moments in the bankruptcy. In particular, the estate hired Alliance Management, and its retention agreement provided that Alliance was subject to the direction of Sun employee Woelcke. Had the evidence not been cumulative, the court may well have made an exception to the cases cited by debtor on the basis that Sun in substance was the estate. Such a ruling, however, would prolong this decision and is not necessary.

significant cash balances. And when it was time for us to make an investment in either additional working capital or other fixed assets, we did it with that cash." *(Testimony of Ed Bachrach, Trial Transcript Vol. 1, at 55–56)*

Although operations were generally funded with cash, the business had lines of credit with financial institutions. BCI used the lines only two or three years in the late 1990s when the business was rapidly expanding. The funds were borrowed on a seasonal basis and all loans were paid off after the holiday season. The banks never required any personal guarantees for the loans, and the lines were unsecured when they were actually used. BCI never had any long term debt during Ed's tenure.

Sometime during the 1990s Ed determined that stores located in smaller cities were not as profitable as those located in major markets. He decided to prune these less profitable stores in favor of consolidating the business into larger markets. BCI's overall sales revenues declined between years 2000 and 2004, due at least in part to planned store closures. However, same store sales were up and down in some of those years and remained flat on an aggregated basis, notwithstanding 9/11's general assault on the economy.[9] During this discrete period, BCI was using more cash than it was generating, although in 2004 it did report positive earnings before interest, taxes and depreciation

(EBITDA) after adjustments for non-recurring items.[10] Such items included store closings and consultant fees incurred to evaluate replacing Ed with outside management so he could pursue other goals.[11]

Between 1999 and 2004 Ed explored selling the family business to pursue a life-long goal of returning to school for an advanced degree in economics and political science. He conferred with investment bankers and consultants but received no offers. During that time, a number of options were discussed. Ed's notes of various meetings included information communicated by the consultants on selling the business, liquidation, bankruptcy, preference actions and elements of fraudulent transfer actions. While there was no evidence on why these matters were discussed, none of the consultants suggested that BCI was insolvent or unable to pay its debts. Ed does not specifically recall why he took notes on these issues—indicating he simply wrote down comments of others but cannot recall the context. *(Testimony of Ed Bachrach, Trial Transcript Vol. 1, at 70)*

Eventually a William Blair investment banker introduced Ed to Sun Capital Partners ("Sun"). On January 11, 2005, Sun delivered to Ed a letter of intent to purchase BCI. In that letter, Sun described itself as follows:

> Sun Capital Partners, Inc. is a leading private investment firm focused on leveraged buyouts and investments in

---

**9.** The comparable decline over five years was less than a half percent. See, for example, the five year comparison total of -0.39% in Plaintiff's Demonstrative Exhibit (PDX) 7.

**10.** Joint Exhibit (JX) 024 at 4, Sun reports that adjusted 2004 EBITDA was a positive $97k.

**11.** Project Euro Shirt, JX 025 at 25: "The Company hired Senn Delaney to provide consulting advice regarding a potential transition from an owner-operated Management strategy to an owner/outside-operated Management strategy. These one-time, non-recurring Management consultant fees have been added back to 2004 EBITDA." See also Sun due diligence, JX 024 at 21: "Non–Recurring Management Consulting Fee–Add–backs represent costs incurred by the Company for external consultants under Mr. Bachrach's initiative to bring in non-family management and directors. This plan was later abandoned."

market leading companies that can benefit from our in-house operating professionals and experience. Sun Capital has invested in more than 75 companies since our inception in 1995 with combined sales in excess of $18.0 billion. On a consolidated basis, Sun Capital's portfolio companies would rank in the top 100 of Fortune Magazine's listing of the 500 largest companies in the United States. Sun Capital has offices in Boca Raton, Florida, Los Angeles, New York and London but has acquired and manages companies worldwide.

*(JX 068 at 4)*

Sun's letter proposed these terms: Sun would pay Sellers $4 million cash, and Sellers would finance the other half of the $8 million purchase price on a subordinated basis. Sun did not want to purchase BCI's real estate, so the letter requested Sellers to keep the real estate and lease it back to BCI. Sun did not want to "buy" BCI's excess cash, so it asked Sellers to withdraw the surplus cash. However, the letter noted that the purchase price would be adjusted up or down to achieve a level of "normalized" working capital agreed to by Sun and Sellers. So if the parties determined that too much cash was withdrawn, the Sellers were required to refund that amount. The offer indicated that the "Acquisition will **not** have a financing contingency associated with this transaction." *(Id. at 2, emphasis in original)* Ed Bachrach, on behalf of BCI, accepted the letter on January 12, 2005, but he had no role in drafting the letter or fixing the major terms of the proposed sale. *(Testimony of Ed Bachrach, Trial Transcript Vol. 1, at 74–75)*

Thereafter, Sun engaged KPMG LLP to assist in its due diligence of BCI. KPMG prepared a report for Sun on or about February 3, 2005, dubbed "Project Euro Shirt." Using prior years' financials from BCI's outside auditors, 2004 financials not yet closed and audited, and management interviews, KPMG observed:

> Assuming a $8 million purchase price for Target's stock, there is no potential step-up in the tax basis of Target's assets in the proposed transaction. In fact, the purchase price is substantially less than the book value of the Target's net assets.

*(JX 025 at 21)*

KPMG also reported that BCI had been without a General Merchandise Manager since April of 2004, and although this may have impacted unfavorably on sales, "[o]ver 95% of its inventory was purchased in the last year. The Company aggressively marks down inventory in order to move merchandise." *(JX 025 at 15, see also 7)* KPMG identified software upgrades that would be necessary and their costs, ranging from $500,000 to over $1 million. "Management expressed that while the deficiencies of the merchandising application are not an imminent threat to the Company's business, operation efficiencies as well as improved analysis and reporting would be improved." *(Id. at 24)* KPMG noted that BCI's assets also included a money market account and small stock portfolio. "As these investment accounts do not represent assets available on a daily operational basis, they were excluded from working capital." *(Id. at 27)* As of December 2004, BCI's working capital[12]

---

**12.** "Working capital" refers to current assets minus current liabilities. *(Testimony of Ed Bachrach, Trial Transcript Vol. 1, at 217)* Positive working capital means that the company is able to pay off its short-term liabilities. Negative working capital means that a company is unable to meet its short-term liabilities with its current assets (cash, accounts receivable and inventory). *See, e.g.,* http://www.workingcapitaldefinition.org/ (last visited July 15, 2012.). It is often referred to as "Net Working Capital," e.g., See definition in the Stock Purchase Agreement prepared by Sun's attorneys. *(JX 01 at 8)*

was reported at $14,533,000 and adjusted to $11,082,000. This amount was in excess of the working capital used to run the company from January 2002 through December 2004 without incurring any difficulty with vendors or other obligations. *See* BCI's adjusted working capital on a monthly basis from 2002 to 2004. *(Id. at 41–43)*

KPMG reported BCI's investment cash at $5,879,000 in December of 2004. While BCI's cash investments declined from 2002 and 2003, this amount was *in addition* to the working capital needed to run the company. *(Id. at 27 and 47)*

Sun also performed its own due diligence on BCI, and in February 2005 observed: "For the FY04, the Company generated $88,227k in revenue and approximately $97k in EBITDA, adjusted for non-recurring expenses and income. Based on industry and comparable company growth assumptions, improvements in merchandising and inventory management, and reductions in SG & A,[13] SCP believes Bachrach's EBITDA can improve significantly over the next five years." *(JX 024 at 4)* Sun called the proposed deal an "Attractive Purchase Price" and stated: "In addition, a strong base of current assets (inventory and accounts receivable) provided opening excess availability (borrowing capacity) of approximately $7.0 million." *(Id. at 9)* Sun noted that BCI's recent stumbles were due to personnel issues involving poor, or lack of, merchandise management and Ed's desire to disengage from his management role. Sun felt that its staffing "will provide Bachrach with the support and leadership needed to further build enterprise value . . . ." *(Id.)* In particular, Sun noted that new management could correct recent inventory imbalances:

> [T]he Company's recent operating performance has been negatively impacted by poor inventory planning. In 2004, management underestimated strong comp store sales in the first quarter, leading to an under-inventoried position and negative comp store sales in the second quarter. In response to this error, management increased inventory purchases in the fourth quarter of 2004 and first quarter of 2005, leading to an over-inventoried position and excessive mark-downs which have reduced overall gross margins. Improved merchandise and inventory planning should restrict servred [sic] swings in working capital, improve comparable store sales performance, reduce inventory markdowns, and improve gross margins and overall profitability.

*(Id. at 10)*

Although Sun's offer to purchase BCI was not contingent on any financing, Sun's "Private & Confidential" due diligence already contemplated replacing BCI's $7 million line of credit with $20 million, based on the strength of BCI's assets: "The table to the right presents an estimated borrowing base at close based on the below terms as presented by LaSalle Bank. Bachrach currently maintains a line of credit with LaSalle Commercial Banking but does not draw on it. Sun Capital received a term sheet from LaSalle Retail Finance for a $20 million Senior Revolver . . ." *(Id. at 16)*

## 2. Events at Closing of Sale to Sun

The parties set February 15, 2005, to close the sale of BCI to Sun. As set forth in its initial letter of intent, Sun was not interested in purchasing the two pieces of real estate owned by BCI. Therefore, on or about February 8, 2005, the Sellers formed Barsaled as an Illinois limited liability company. Barsaled, a defendant in this case, is owned by Sellers and was set

---

13. Selling, general and administrative expenses.

up to hold title to real estate formerly owned by BCI. On or about February 15, 2005, BCI conveyed One Bachrach Court in Decatur, Illinois (the "Warehouse") to Barsaled. The value of this property was approximately $3,350,000. Similarly BCI conveyed to Barsaled property located at 357 W. Decatur Street in Decatur, Illinois (the "Mansion"). This property was later sold on August 15, 2005, for a purchase price of $420,000. Barsaled received cash at the Mansion closing in the amount of $371,871.78.

Sun also had no interest in purchasing BCI's investment cash,[14] so in conjunction with the sale, BCI distributed to Sellers cash and marketable securities owned by BCI in an aggregate amount of $3,400,000.00.[15] The foregoing distributions to Sellers, together with some furniture and miscellaneous items, were assets that Sun did not want to purchase from Sellers. As such, Sun requested Sellers to take these items and considered those steps as part of the Stock Purchase Agreement. *(JX 001 at 325, IIA)* Sun was not concerned about removing the investment cash from the company because BCI was generating cash, paying its obligations as they became due, and had substantial additional borrowing capacity to meet its obligations. *(Leach Dep. Tr. at 11–112)*

After excluding these assets, the purchase price for BCI was fixed at $8 million. Auditors indicated this purchase price was about $5 million below the historical book value of BCI's assets. *(Seiler Dep. Tr. at 65, 67)* Sellers would receive $4 million cash at closing,[16] subject to a working capital adjustment up or down to be agreed on

later, minus an escrow and closing fees, plus a $4 million subordinated note. The buyer and maker of this subordinated note was Bachrach Clothing Holding Corp. ("Holdings"), a Delaware corporation formed by Sun to hold BCI's stock. As part of the deal, Sellers received 7.5% of the shares of Holdings. The majority and remainder of Holdings' shares were owned by Sun Bachrach, a Delaware limited liability company, also formed by Sun Capital Partners in connection with the sale. Tab 11 to the Closing Binder, entitled "Closing Sequence and Flow of Funds Memorandum," dated February 15, 2005 (the "Flow of Funds Memo"), details how the Sun entities acquired BCI with very little contribution of their own capital. *(JX 001, Tab 11, p. 324)* Ed Bachrach, representative of the Sellers, testified that he did not see the Flow of Funds Memo until the end of the closing, and:

Q. What input did you have into the contents of this document?

A. Zero.

Q. Is that the same answer for your sisters?

A. Yes.

Q. When is the first time you saw this document?

A. I saw it at the closing when—it was one of the last things that I saw when we were—I was signing the different documents in the closing.

*(Trial Transcript, Vol. 1 at 65)*

Nothing in the record contradicted Ed's testimony that the Sellers were unaware of how Sun and/or Holdings planned to fund

---

**14.** As defense counsel opined: "[W]ho buys cash? Why would any company ever buy $3.4 million in cash?" *(Trial Transcript Vol. 1 at 31)* Logically Sun would want Sellers to withdraw cash and securities in excess of required working capital, since retention of the cash would simply increase the purchase price and debt service.

**15.** A debt to one of the Sellers in an approximate amount of $50,000 was also forgiven as part of the deal.

**16.** This was separate from the $3.4 million distribution of cash and marketable securities withdrawn by Sellers.

purchase of the business. Ed further testified:

Q. My question is, what was your role in structuring it and doing the paperwork for it and figuring out where the money was coming from and all that?

A. None.

Q. Okay. How was this money—this 3.1 million, how was it paid to you?

A. It was wired to our account.

Q. Wired by whom to whose account?

A. It was wired by the seller to our bank accounts.

Q. And when you say seller, who do you mean?

A. I mean the buyer.

Q. When you say buyer, who do you mean?

A. Sun Capital Partners.

Q. Okay. You distinguished—at the time of closing, were you distinguishing between Sun Capital Partners and Sun Bachrach and Bachrach Clothing Holding Company and the new BCI? Were those distinctions that were being made?

A. I wasn't making those distinctions.

Q. Okay. Did you have any role in determining how mechanically this money would be sent to you? And by that I mean whose accounts—anything about the structure of how money physically got to you?

A. No.

Q. I presume the buyer did.

*(Id. at 66–68)*

The Flow of Funds Memo occupied pages 324–332 of 684 pages of closing documents presented to the Sellers on February 15, 2005. *(JX 001)* The Flow of Funds Memo reveals that two Sun Capital Partners III entities transferred a total of $2 million to Sun Bachrach, LLC, in exchange for all of the membership or equity interest in Sun Bachrach. Sun Bachrach then contributed the $2 million to Holdings.

Five hundred thousand of the $2 million was for Sun Bachrach's purchase of all of Holdings stock except for the minority 7.5% interest held by Sellers. The remaining $1.5 million was a loan by Sun Bachrach to Holdings, as evidenced by a promissory note made by Holdings in favor of Sun. *(JX 001 at 326–327)* On the day of the closing, Sellers loaned Holdings $1,969,295.89 of the cash due to Sellers at closing. *(Id.)* Immediately after Holdings acquired BCI, Sellers were replaced as directors of BCI by two Sun executives, Lynn Skillen and Kevin Calhoun. These new directors caused BCI to borrow $2 million from Harris Bank. This loan was guaranteed by Sun. The new directors then immediately declared a dividend from BCI to Holdings in the amount of $1,969,295.89. The new directors concluded that BCI was solvent at the time of the dividend, which was February 15, 2005. *(Id. part IV. at 675)* Ed did not see this declaration of dividend document until *after* BCI brought this lawsuit against him and his sisters. *(Trial Transcript, Vol. 1 at 86)*

Sun saddled BCI with $2 million in debt so it could upstream the money to Holdings. Holdings then used the Harris loan proceeds to pay off the $1,969,295.89 note to Sellers [17] as well as management and acquisition fees to Sun. Notwithstanding the $8 million purchase price, Sun managed to satisfy that commitment with a mere $500,000.00 of its own capital and a $1.5 million loan to Holdings. Sellers financed the balance of the sale by accepting a $4 million note from Holdings, which was subordinate to other debt, including Holdings' $1.5 million debt to Sun Bachrach.

The sequence and flow of funds at this closing was directed, orchestrated and coordinated by Sun-controlled entities and their attorneys. Sellers were not involved

---

17. See cancelled note contained in Closing Binder, Tab 7, JX 001 at 245.

in Sun's idea to burden BCI with a big chunk of the purchase price or any of Sun's plans as to how it was going to structure the deal. *(Testimony of Ed Bachrach, Trial Transcript Vol. 1, at 83–85)* Indeed, Sellers had every reason to believe they were transferring their family business to a powerful group with the financial muscle and expertise to support BCI, which had thrived for over a century. *See, e.g.,* Ed's testimony regarding Sun's letter of intent:

Q. In paragraph 2, Sun represents in this letter of intent that it was a $500 million investment fund. Do you see that?

A. Yes.

Q. Was that representation significant to you?

A. Yes.

Q. Can you explain to the court and me what the significance of that representation was to you?

A. That meant two things: It meant that they had the funds to make the acquisition, and they also had the funds to operate the company afterwards.

*(Testimony of Ed Bachrach, Trial Transcript Vol. 1, at 82)*

During his deposition, Ed also testified that he was not specifically aware that Sun intended to use bank debt to fund BCI's operations. *(Bachrach Dep. Tr. Vol. 1 at 199–200)* Not a single witness contradicted Ed's testimony that he and his sisters played no role in Sun's acquisition tactics.[18] Ed was ready to exit the business. Sun was the only game in town—and in charge.

### 3. Events After BCI Sold to Sun

None of the Sellers remained directors of BCI after the closing. Although the evidence establishes that Ed planned to eventually withdraw from active management, it was unclear what his immediate post-closing role was supposed to be, particularly before Sun selected a new CEO. Ed testified that on the day of the closing, he asked Scott King, head of Sun's operations, what Sun wanted him to do. King replied, "[S]tay in your position and just keep running the company as you have been. And that's all he told me." *(Id. at 86–88)* Nevertheless, after the sale, Ed was not included in the BCI officers and/or directors who could arrange borrowings and execute notes on behalf of BCI. *(Id. at 90)* That was reserved primarily for Sun employees. Before the closing, Ed answered only to himself. After the closing, he reported to Scott King and was not involved in any post-closing borrowings by BCI. *(Id. at 91)* King had experience in retail but not men's clothing. *(Woelcke 2009 Dep. Tr. at 118)*

Gerald Woelcke, a Sun vice president of operations, became directly responsible for overseeing Sun's investment in BCI after the closing. Woelcke also had no experience in men's retail clothing. *(Testimony of Ed Bachrach, Trial Transcript Vol. 1, at 106; Woelcke 2009 Dep. Tr. at 29–30)* In fact, neither of Sun's principals nor any of BCI's new directors had experience in a men's retail clothing store. *(Woelcke 2009 Dep. Tr. at 80, King Dep. Tr. at 42)* King and Woelcke interviewed Sheila Arnold for the CEO position at BCI. King had the final say to hire Arnold and Ed was not consulted on that decision. Arnold joined

---

**18.** The only document that reflects any input or negotiation was Ed's request that the subordinated note have a junior lien in BCI's assets. There is nothing unusual about this request when ceding control of valuable assets in exchange for a note from a company that only owns the assets you are financing. The court does not consider this any exceptional scheme to defraud unsecured creditors whose claims arose primarily as a result of Sun's later decision to cut off funds to BCI.

BCI as CEO in mid to late April 2005. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 108)* Arnold had been head of merchandising at Sunglass Hut. Arnold also had no experience in men's retail. *(King Dep. Tr. at 97 and 99; Arnold Dep. Tr. at 147)* Ed offered to transition Arnold into the business but she did not accept his help. Instead, about 9 days after joining BCI, Arnold told Ed that May 3, 2005, would be his last day with the company. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 108–109)* William Lee,[19] BCI's director of planning and allocation for nearly five years, testified that Arnold's knowledge of menswear appeared limited:

Q. Was there anything that she said or did that made you wonder about her experience?

A. In one of our early projection meetings we were discussing men's suits, and we were discussing the styles of suits. And the point came up that this suit had side vents, and she said, what are side vents. And I stood up and said, well, you know, these are side vents. There's only side vents, center vent, or no vent. It struck me as kind of odd that a head of a menswear company would not know something as basic as that.

Q. That is pretty basic knowledge for the industry?

A. There's only three. I would think every guy would know that.

Q. When she came, did she take any actions that you thought were bad ideas?

A. Well, she immediately got rid of Robert and Ed. And I—thought, you know, they were the two most knowledgeable people. They certainly had years of history at the company.
*(Id. at 55–56)*

Although Ed recommended that Robert Greening be replaced as BCI's acting merchandise manager (hoping this would improve BCI's inventory balances), Arnold's rapid termination of both Ed and Robert left a vacuum of knowledge. King, who hired Arnold, certainly thought Ed's input post-sale would be valuable. *(King Dep. Tr. at 60, 67)* Nevertheless, Arnold was uncomfortable with Ed, whom she felt was spending too much time poking around the business and second guessing her decisions. King let her make the call to remove Ed from the business, as she was the new CEO. *(Id. at 104–107; Arnold Dep. Tr. at 43)* While the position of merchandising manager was critical, Arnold left it open for almost two months until she hired Larry Schechterman in June. *(Testimony of Larry Schechterman, Trial Transcript, Vol. 2 at 11)* Ed felt Larry was a poor choice as he had interviewed him in the early 2000s twice for merchandising manager and did not think he could do the job. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 143–144; 206–207; Testimony of Larry Schechterman, Trial Transcript, Vol. 2 at 46)* In fact, in the last ten years up to Schechterman's testimony at trial, he had occupied seven jobs; one of which he left involuntarily. *(Id. at 48)*

After Ed and Robert exited BCI, and after running BCI for only a few weeks, Arnold decided to mark down BCI's store and catalogue inventory roughly $7 million more than the amount budgeted for the May 2005 month markdown. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 115)* This markdown was 285% more than was budgeted for markdown during that month. In her history as BCI's CFO,

---

**19.** Lee started his career with Neiman Marcus before joining BCI in 2001. After BCI, he worked for Wickes Furniture, another company owned by Sun. *(Testimony of William Lee, Trial Tr. Vol. V at 39–40)*

Kristin Sowa had never seen a markdown that varied so much from budget. This markdown was Arnold's decision; Ed was gone and had no role in the markdown. Sowa stated that "Sheila shut off his e-mail address so that we would not communicate with him or issue reports to him after she arrived." *(Dep. Tr. of Kristin Sowa, Vol. 2 at 180)* It would be very difficult for BCI to survive such a massive hit. *(Id. at 166, 203)* Moreover, there was no urgent necessity to take such a drastic markdown all in the month of May, as William Lee testified:

Q. How much of a markdown was built into the budget for May 2005?

A. Plan was 1.7 million.

Q. How would you describe that in comparison to the budget?

A. It's nowhere near the budget. I mean, it's not even in the same ball park.

Q. Do you recall any reason that it was urgent that the markdown be taken right then?

A. No.

Q. That a markdown be taken right then?

A. No.

Q. Do you recall whether it was necessary that the markdown be taken all at the same time?

A. No.

*(Testimony of William Lee, Trial Transcript, Vol. 5 at 61)* Indeed, Ed made an effort to cut substantial fat out of the inventory in December 2004, before he sold BCI to Sun in February 2005. He took an actual markdown of $6.8 million compared to a budgeted markdown of $3.8 million. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 263–264)*

There was nothing unusual about BCI's inventory when Arnold made her decision to markdown such an extraordinary amount just a few weeks after joining BCI, and no one from Sun had raised any concerns about the inventory to Ed. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 104; Testimony of William Lee, Trial Transcript, Vol. 5 at 53–54)* Testimony that BCI's inventory was too old was based solely on second hand knowledge. Larry Schechterman was not employed when the markdown was taken and his comment that BCI repacked and stored old merchandise was not based on first-hand experience. *(Testimony of Larry Schechterman, Trial Transcript, Vol. 2 at 51)* Schechterman was particularly unconvincing in light of William Lee's testimony that it is much more expensive and impractical to store merchandise than to mark it down for sale. As a result, BCI did not generally repack and store out of season merchandise.[20] *(Testimony of William Lee, Trial Transcript, Vol. 5 at 48–52)* Lee was directly involved while Schechterman was not. King asserted that BCI had the habit of re-boxing old inventory like sweaters but he also testified that he relied on Lee's assessment of the inventory situation. *(King Dep. Tr. at 88 and 124)* The only witness presented in court who was directly involved was Lee and he contradicted the re-packing rumors repeated by King, Woelcke and Schechterman—all of whom had no direct knowledge.[21] Additionally in its due diligence on

20. BCI spent a substantial amount of trial time attempting to establish the opposite by pointing to some expensive winter coats like shearling, for example, that may have been retained from one season to the next. *(Trial Transcript, Vol. v. at 140, 154–155, 164)* This was an insignificant amount of inventory that would not have justified the massive markdown taken under Arnold's direction.

21. Lee and Schechterman were hired by Robert Greening and Sheila Arnold respectively. Both may have exhibited loyalty to their former bosses when evaluating the inventory balance, but Lee was much more convincing in

BCI, KPMG reported: "Over 95% of its inventory was purchased within the last year." *(JX 025 at 10)* In general, BCI may have stored some merchandise for the next year's season, but it was an insignificant amount, which consisted of basics that rarely went out of style. More importantly, it was no secret that BCI had some inventory issues in the years before the sale and that is exactly why Sun thought new management could improve performance. *(See Sun's due diligence JX 024 at 10)*

Arnold's decision to take such a massive markdown was consistent with bringing a new vision to, or re-branding BCI. In her deposition she stated that she decided what to mark down by looking at styles of clothing. *(Arnold Dep. Tr. at 163)* She did not define obsolete inventory as items in storage but rather "[i]nventory that you don't want in your inventory anymore." *(Id. at 166)* She worked primarily with Lee in making the markdown decisions. Lee's testimony was adamant that BCI's inventory was not too old or in storage. Arnold's presentations to Sun certainly reflected that she planned to change the style or type of merchandise offered by BCI: "2005 Review–Initial Findings–Brand positioning not clear" *(JX 005 at 781)* and "2006 Overview–Merchandise Focus–Introduction of merchandising ***new looks across all categories***" *(JX 007 at 881,* emphasis added*)* Prior to taking the massive May 2005 markdown, Arnold testified she ran her plan by Scott King of Sun:

Q. Who did you speak with about it?

A. Scott King.

Q. What did you tell him?

A. I went through my evaluation and what we were planning to do and to let him know it was a ***huge markdown and it was going to have a big impact on the business*** and I wanted to make sure he was comfortable with the decision. *(Arnold Dep. Tr. at 169, emphasis added)*

Despite Arnold's position as CEO of BCI, she paid little attention to the line of credit BCI/Sun had secured from Harris and LaSalle. "Q. Did you pay attention to the availability of the line, the lending line? A. Not on a regular basis." *(Arnold Dep. Tr. at 105)* She did not recall receiving regular reports on lending availability. *(Id. at 110)* Generally, she left such matters to Kristin Sowa and Gerald Woelcke. Overall, Arnold's memory of what occurred during her leadership tenure at BCI was scant. However, Sun personnel Woelcke and Jason Leach acknowledged that the huge May markdown reduced BCI's inventory and ability to draw on bank credit. *(Woelcke 2004 Dep. Tr. at 153–157; Woelcke 2009 Dep. Tr. at 98–101; Leach Dep. Tr. at 116–118)* Leach, who handled much of the credit arrangements Sun set up for BCI, observed that the almost immediate reduction in financing availability was not expected when the business was purchased. *(Leach Dep. Tr. at 120–121)* This court agrees with Defendants that: "[Arnold] obviously did not appreciate the importance of borrowing availability, or how the markdown would affect it. Between April 30 and June 30 [2005], BCI's borrowing base dropped from $4.32 million to $1.3 million. *(JX 17 at BACH–D1744; JX 13 at BACH–D1698)* Arnold's markdown wiped away almost $3 million of BCI's working capital." *(Bachrachs' Post–Trial Brief at 30)*

Arnold made other decisions that compounded the cash squeeze. She reduced the number of pages contained in BCI's

---

his testimony because he was present at that time, and he gave a very logical reason why a clothing retailer would incur more expense packing and storing clothes for a future season rather than marking the clothes down. Woelcke could not recall who told him there was too much inventory. *(Woelcke Dep. Tr. at 92–93, 104)*

clothing catalogue and reduced the circulation. Although it was unclear who hired a part time DJ to re-design BCI's web site,[22] it was undisputed that the new site went online during Arnold's tenure.[23] All agreed the new site was a disaster and eventually BCI returned to its old website. These decisions significantly reduced sales and profit margins in BCI's catalogue and internet categories. Defendants also established that Arnold reduced inventory orders for holiday merchandise which further depressed BCI's sales. *(See citations to testimony in Bachrachs' Post–Trial Brief at 30–32)*

Sun's decisions also added to BCI's liquidity crunch. When CFO Kristin Sowa asked how new management wanted to handle BCI's long-term incentive plan, Arnold and Woelcke decided to terminate it, which generated a $1 million charge in 2005. *(Sowa Dep. Tr. Vol. 2 at 187–191)* Sun also assessed BCI a recurring management fee of $100,000 per quarter *(DX 153)* and the costs of purchasing BCI, including due diligence and attorneys' fees. *(DX 104)* CFO Sowa identified $550,000 paid by BCI to Sun for the period of February 14th to March 31st 2005. *(Id. at 170–171)* Also in 2005, Sun caused BCI to assume over $800,000 in Kirkland and Ellis legal fees relating to the Sun purchase of BCI and setting up bank lines of credit. *(DX 102, 103, and 152)* BCI had never incurred anything close to this in legal fees prior to the sale, and Ed testified that such large bills would have an impact on BCI's business. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 129–120)* Arnold testified that even $100,000 is a substantial amount of money to a company the size of BCI. *(Arnold Dep. Tr. at 159)* Yet, these extraordinary costs totaled over $3 million in 2005. The court agrees with Defendants' conclusion: "In the wake of a leveraged buyout, Sun caused 30 times that amount to flow out of the company, mostly for its own benefit." *(Bachrachs' Post–Trial Brief at 33)*

In contrast to Sun, the Sellers actually contributed to BCI's liquidity following the sale. In setting the purchase price, the parties agreed that if BCI's working capital exceeded the target amount of $10,235,000.00, Sun would pay more, but if actual working capital was less than the target amount, Sellers would refund an amount equal to the difference. This adjustment was agreed to because Sun wanted Sellers to take the *excess* cash out of the business. An audit would follow to assure that BCI retained sufficient cash for its operations. Following the sale, Woelcke presented a detailed working capital analysis to Ed, requesting a refund of $1,245,536.78. *(DX at 041)* Ed disagreed with the number, but in late summer of 2005, the Sellers returned $545,480.54 of the BCI cash to resolve the working capital adjustment. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 134)* Just as Sun preferred to minimize the purchase price of BCI by not buying its excess cash, Sun elected to lease BCI owned real estate instead of buying it. When fixing the rent to be paid to Barsaled, which held title to real estate formerly owned by BCI, Ed made a million dollar math error in favor of BCI/Sun for each year of the lease. Sun refused to pay more rent, so Ed honored his original proposal and gifted BCI a substantially below market lease. *(Testimony of Ed Bachrach, Trial Transcript, Vol. 1 at 81)*

---

**22.** Lee initially testified Arnold hired the DJ-store manager to redesign the web site but wavered when asked for more specifics on cross-examination.

**23.** Regardless of which management team started the re-design project, Arnold is responsible for failure to test the new design's ability to handle ecommerce before retiring the old site, which was functioning.

In summary, the decisions made by Sun/Arnold after Ed's departure exhausted BCI's borrowing availability much sooner than expected. Arnold rapidly changed BCI's course without regard to the effect on its borrowing base. Arnold testified she paid no or little attention to BCI's lines of credit when she took the massive May markdown. There was no evidence that it was necessary for BCI to absorb this colossal hit so early and all at once. Indeed, Lee testified quite the opposite.[24] At the same time, other decisions reduced BCI's revenue, such as cutting back on catalogue pages and circulation and adopting a new website which did not work. Sun's election to invest very little equity at the time of purchase, while charging BCI over a million dollars in due diligence and attorneys' fees for the acquisition, and an annual $400,000 management fee, also stressed BCI.

Sun asked Sellers to keep the real estate and lease it back to BCI. Contrary to BCI's assertion that the new rental payments added to its burden, this feature was really a wash given the way Sun structured the purchase. For example, if the real estate was worth $4 million, the purchase price of BCI would have increased by that amount. Instead of having BCI borrow $2 million from Harris to fund Sun's acquisition, it is likely Sun would have caused BCI to borrow an additional $4 million for the real estate. Higher interest payments to Harris would have been made in lieu of lease payments to Barsaled. Given Ed's million dollar annual lease payment error in favor of BCI/Sun, Sellers' retention of the real estate actually benefited BCI's creditors. In all likelihood BCI would have borrowed $4 million more from Harris and Sun's later purchase of the Harris loan would have resulted in a "secured" claim $4 million higher. A similar analysis applies to the excess cash withdrawn by Sellers because Sun did not want to buy cash.

### 4. Sun's Responses to BCI's Liquidity Needs

Provided there is a likelihood of success, Sun injects capital into its companies. *(Woelcke 2009 Dep. Tr. at 195)* Sun Bachrach made its first additional investment in BCI on December 29, 2005, when it purchased the $2 million bank loan Harris made to BCI in July 2005, which Sun had guaranteed. *(JX 62–63)* Next, in March and April of 2006, about a year after the purchase of BCI, Woelcke informed Ed that Sun was going to make an additional equity investment in BCI. He told Ed and his sisters that their stock interest would be diluted if they did not also contribute. Ed and his sisters did not participate in Sun's offer. *(Woelcke 2009 Dep. Tr. at 124–126)* Sun employees originally considered the additional capital it gave BCI as an equity investment. *(Id. at 168–169; Woelcke 2004 Exam Tr. at 128–130; Sowa Dep. Tr. Vol. 2 at 195–197)* However, BCI's CFO Kristin Sowa ultimately executed a $5 million secured note in favor of Sun Bachrach. Two million of the note's obligation represented Harris' assignment of its BCI loan to Sun Bachrach and the remaining three million was new dollars invested in BCI by Sun Bachrach. *(Woelcke 2009 Dep. Tr. at 124–126; Sowa Dep. Tr. Vol. 2 at 192–193)*

Although the $5 million note was dated March 3, 2006, Ms. Sowa did not execute it

---

24. Debtor's expert, Craig Elson, noted that no one "pushed back" on Arnold's decision to take the massive markdown. He ignored the possibility that BCI employees might have remained mute to protect their jobs, especially after observing how fast Ed and Robert Greening were ushered out the door by Arnold. Certainly a subordinate's failure to push back on the CEO's decision is not synonymous with agreement.

until much later in May—*a few days after Sun began discussions about putting BCI in bankruptcy.* *(Woelcke 2009 Dep. Tr. at 127–13; Sowa Dep. Tr. Vol. 2 at 199–201)* Once Sun decided to stop funding BCI, it "papered over" its equity investment by having Sowa sign the note in May of 2006. This note incorporated all the terms of the Harris loan agreement with BCI and reflected Sun's investment in BCI of $5 million. *(DX 13; Woelcke 2004 Exam Tr. at 132–134)* By purchasing the Harris note and increasing BCI's debt to cover the additional $3 million contribution with a back-dated note, Sun Bachrach converted most of its capital contribution into a secured claim. *(JX 063)* Shortly after Sun Bachrach elevated its investment to a position ahead of BCI's unsecured creditors, Sun's principals decided to pull the plug on BCI. BCI filed bankruptcy a few weeks later on June 6, 2006.

Arnold believed that Sun gave up too soon and should have invested more capital. They did not permit her to implement the changes that she felt would make BCI a success and instead instructed her to file bankruptcy. *(Arnold Dep. Tr. at 178–180)* The co-CEO of Sun Capital, Marc Leder, apologized to Arnold for abruptly ending the funding to BCI. *(Id. at 219–221)* Sun was in a position to invest more into BCI if it wanted to. *(Woelcke 2009 Dep. Tr. at 70–71)* Leder never complained to Ed that BCI failed due to insolvency or lack of working capital. Instead he agreed that BCI was mismanaged and told Ed he was sorry. *(Testimony of Ed Bachrach, Trial Transcript Vol. 1, at 140–141)* [25]

Prior to the filing of this action, no one even suggested that BCI was insolvent or lacked funds to pay its debts as they became due. Sun personnel believed that BCI was solvent and had adequate working capital at the time of the sale. *(King Dep. Tr. at 167–168; Leach 2004 Tr. at 110–113; Woelcke 2009 Dep. Tr. at 20–23).* BCI's CFO Sowa, a Certified Public Accountant, testified that BCI was solvent at the time of the sale and could pay its debts as they became due. *(Sowa Dep. Tr. Vol. 2 at 160–163)* As a CPA she also signed a certificate that BCI was solvent on March 29, 2005, and testified that BCI was also solvent on the date the sale closed. *(Id. at 174–175)* BCI auditors McGladrey and Pullen noted that BCI "... had adequate financial backing from new owners ..." and its current assets exceeded its liabilities by at least $5,600,000.00 as of the sale date. *(Seiler Dep. Tr. at 117, 103–104)* [26] Shortly after the sale, LaSalle Bank provided BCI a $20 million line of credit *(Stipulations of Fact for Trial ¶ 89),* and many months after the sale, on July 12, 2005, Harris gave BCI an additional $2 million line of credit. *(Id. ¶ 94)* At trial debtor did not offer *any* testimony from its turnaround consultant, Alliance Capital Management, that BCI was insolvent or undercapitalized at the time of the sale. The only evidence presented to support such financial stress was the hindsight testimony of Craig Elson, an expert hired by the estate after this case was filed, and compensated nearly a million dollars for his team's work.

---

**25.** This testimony was admitted for notice purposes only and not for the truth of the matter that Sun mismanaged BCI. It reflects, however, that the party closest to the business never complained that BCI's problems stemmed from insolvency or lack of capital at the time of the sale. While the court did not consider this as proof of mismanagement by Sun, there is plenty of evidence apart from this statement that leads the court to conclude that BCI was mismanaged by Sun, as opposed to financially stressed at time of sale.

**26.** This net figure included a $5.5 million obligation of Holdings (BCHC) which if excluded from BCI, BCI's worth was even higher. *(Seiler Dep. Tr. at 110–111)*

■ In short, no facts or "real world" evidence support the assertion that BCI was insolvent or undercapitalized at the time Sellers sold it to Sun, even *assuming* sales were declining or it was using some cash reserves. Instead, BCI had no long term debt, was current on payables, and held substantial cash in excess of needed working capital. Sun asked Sellers to keep the real estate and excess cash to reduce the purchase price. Since Sun typically acquires companies through leveraged buy-outs,[27] the lower purchase price more than likely reduced the amount of debt Sun would have caused BCI to incur. This was a rational strategy devised by Sun. The Sellers were not involved in structuring the deal this way. It was all Sun's call and made sense. What did not make sense was to freeze Ed out of the business just a few days after Arnold came on board, particularly when neither she nor any Sun employee involved had experience in menswear retail. Even if Arnold wanted to radically change the style of clothing offered, taking an immediate, huge markdown in one month, without regard to BCI's borrowing availability, was reckless. Other decisions that reduced sales and accelerated liabilities were also unwise. At some point, Sun decided BCI's new management was not going to turn BCI into an asset that Sun could resell for a big profit within its time frame. So, after converting its investment into a secured claim, Sun cut off further funding. Sun/Arnold created BCI's liquidity crisis and Sun's refusal to provide further capital led to this bankruptcy. The Sellers delivered a solvent and properly capitalized company at closing. They had every reason to believe, and Ed so testified, that the financial strength of Sun would ensure BCI's survival.

### 5. Bankruptcy Proceedings

BCI's Chapter 11 petition was filed on June 6, 2006, more than a year after the sale to Sun Bachrach. Arnold executed the petition. Sun's control continued in this bankruptcy. The schedules treat Sun's claim very favorably. Schedule D lists LaSalle's line of credit in the amount of $4,628,658.00 and an unsecured amount of "unknown." Sellers' subordinated note is listed as "0" and unsecured amount as "unknown." However, Sun Bachrach's claim is portrayed as *fully* secured in the amount of $5,141,643.84. This "secured claim" is what a Sun employee characterized as an equity investment until shortly before BCI's bankruptcy. The Statement of Financial Affairs reflects that Sun employees Woelcke and King were BCI's directors at the time of filing. (¶ 21) One day after filing its petition, BCI filed an emergency motion for use of cash collateral, contending that both LaSalle and Sun Bachrach were secured but that Sellers' subordinated claim was not. Although BCI's motion questioned Sellers' lien, it mentioned nothing about Sun Bachrach's backdated note, which converted its investment, initially referred to as equity, into a secured claim in May 2006. *(Docket # 7)*

A few days later, on June 9, 2006, BCI asked this court to approve the employment of Alliance Capital Management to assist the Debtor with its restructuring. BCI noted that Alliance had been working prepetition with BCI and received a retainer, which had not been completely used. The engagement letter, attached as Exhibit B to the motion, indicated that Alliance was retained in May, the same month the $5 million BCI note to Sun Bachrach was backdated and signed by

---

**27.** A leveraged buy-out or LBO is typically understood as the use of a target company's assets to secure a loan to purchase the target company. Usually, the buyer invests very little of its own capital, relying on the assets of the company to be purchased to finance the purchase.

BCI CFO Sowa. The letter also clarified that Alliance was subject to the direction of Woelcke, a Sun employee. "Consultant shall receive general direction from Mr. Gerald Woelcke and Ms. Sheila Arnold." *(Docket # 21, Exhibit B, ¶ 7, 1.0)*

Not surprisingly, in the June 7, 2006 order granting motion to use cash collateral, BCI stipulated that Sun Bachrach had a fully secured claim in an approximate amount of $5 million "plus". *(Docket # 28, ¶¶ k–n)* [28] As a result, the order granted LaSalle and Sun Bachrach veto power over BCI's ability to spend any money along with the right to receive daily expenditure reports. *(¶ 18)* Until LaSalle and Sun Bachrach were paid in full, BCI had no right to obtain other secured credit. *(¶ 28)* While the order gave a trustee or committee a limited investigation period to evaluate claims of LaSalle (60 days) and/or Sun Bachrach (100 days), it also stated that no cash collateral could be used to prosecute a claim against Sun Bachrach. *(¶ 61 and ¶ 46)* Moreover, if the objector lost, LaSalle and/or Sun's attorneys' fees in defending *any* lawsuits broadly defined as arising out of or relating to their claims would become an administrative claim against the estate. *(¶ 62)* This order, entered one day after BCI filed its case, gave Sun extraordinary leverage over any committee that would be appointed. No estate funds could be used to challenge Sun Bachrach's "secured" claim, and if any committee or trustee filed suit relating to such a claim (for example—a fraudulent transfer action) and lost, all of Sun Bachrach's attorneys' fees would be paid before unsecured claims. At the time the order was entered, no committee had been formed [29] and Sellers' counsel did not enter their appearance until June 27, 2006.

In return for LaSalle and Sun Bachrach's agreement to permit BCI to use cash collateral, BCI agreed to quickly put its assets up for sale. A motion to approve bidding procedures was filed on June 13, 2006. In this motion BCI insisted Sun Bachrach was fully secured but argued Sellers were not. *(Docket # 40, p. 13 ftn. 2)* The newly appointed Committee filed an objection, arguing that the sale was being

---

**28.** Debtor's stipulation reasoned that since the original $2 million Harris loan was valid and perfected, Sun Bachrach's purchase of the note, and subsequent amendment of the Harris loan agreement to add $3 million more renders the entire $5 million a secured lien on BCI's assets. During these early cash collateral hearings, Debtor did not disclose that Sun added the $3 million it advanced in March 2006 to a note that was backdated to March but actually signed by BCI in May, shortly before the June 6 bankruptcy filing. Moreover, Debtor did not reveal that Sun employee in charge of BCI, Woelcke, originally referred to the $3 million as equity and cautioned Sellers that their stock interests would be diluted if they did not also contribute funds. While the issue of whether Sun's $5 million secured claim could be recharacterized as equity is not before this court, the facts suggest a strong argument could have been made to do so. In another case involving a Sun investment, the bankruptcy trustee sought to recharacterize Sun affiliate NLC Holding's loan to a debtor as equity. The bankruptcy court denied both parties' motions for summary judgment, but it set out a number of tests that could have applied to change Sun's claim in this case. *Menotte v. NLC Holding Corp. (In re First NLC Financial Services, LLC)*, 415 B.R. 874 (Bankr.S.D.Fla. 2009). Validating Sun's secured claim creates a troubling precedent. Although BCI borrowed the $2 million from Harris, Sun issued a very broad guarantee. On the hook anyway, Sun bought the $2 million Harris loan and combined its $3 million March investment in BCI into the Harris loan documents by amending the loan agreement and backdating the $5 million note. This maneuver should not *per se* shield Sun's secured claim from attack. Yet, BCI capitulated and focused on getting money from Sellers instead. It suggests Sun's continued control of BCI during these bankruptcy proceedings.

**29.** The Committee was appointed on June 12, 2006. *(Docket # 37)*

run for the benefit of LaSalle and Sun Bachrach only, was happening too fast, and that Sun Bachrach was an insider whose secured claim might be recharacterized as equity.

On or about June 30, 2006, several companies ("Joint Venture") were selected at auction to act as agent to sell BCI's merchandise, which was authorized by order of this court on July 10, 2006. *(Docket # 126)* Exhibit 1 to that order contained the agency agreement whereby the Joint Venture would essentially run a "going out of business" sale for BCI. A final cash collateral order was also entered on July 6, 2006, which repeated BCI's stipulation that Sun Bachrach held a fully secured claim and gave the Committee 120 days to investigate that claim, but blocked the use of cash collateral to prosecute any claim against Sun Bachrach and extended an administrative priority for its attorneys' fees if Sun's secured claim was unsuccessfully challenged. The same provisions controlling Debtor's budget were implemented. *(Docket # 139)*

On July 14, 2006, Sellers filed a motion requesting adequate protection of their subordinated lien. *(Docket # 160)* On July 25, 2006, Sellers also objected to BCI's intent to pay off Sun Bachrach's lien with sales proceeds, noting that the investigation period on Sun's claim had yet to expire. *(Docket # 174)* Sellers withdrew their objection *(Docket # 180)* in light of certain provisions added to the Amended Final Cash Collateral Order on July 27, 2006, including extension of the challenge deadline. In that order, BCI stipulated that Sun Bachrach held a valid and perfected secured lien, subject to the specific challenge provisions in paragraphs 61–63 of the order. Paragraph 22 provided that BCI pay Sun Bachrach no less than $2,179,577.00 on account of its prepetition claim in three days, with additional payments as BCI accumulated funds. *(Docket # 182)*

While many of the Amended Final Cash Collateral Order's provisions appeared in prior cash collateral orders, paragraph 45 introduced a subordinated carve-out for unsecured creditors. Essentially, Sun Bachrach agreed to pay unsecured creditors up to a million dollars if Sun's allowed secured claim equaled $5,570,000.00 or more. Paragraph 46 continued the provision that the carve-outs could not be used to prosecute a claim against Sun Bachrach. To complete the deal, on October 5, 2006, Sun Bachrach requested this court to liquidate the amount of its secured claim. Its motion indicated that before the sale to the Joint Venture, BCI's cash was $2,100,000.00. On July 14, 2006, BCI received $9,585,858.00 from the Joint Venture and another payment of $1,167,339.63 on August 2. *(Docket # 227, ¶ 11)* LaSalle was paid in full with $4.9 million of the Joint Venture sale proceeds. *(¶ 12)* Sun Bachrach also disclosed that to date, it had received payments from BCI totaling $3,477,422.63. *(¶ 14)* Sun argued that it was oversecured and thus entitled to interest on its claim. Sun also pointed out that pursuant to its sharing agreement, the unsecured creditors get nothing unless Sun Bachrach's claim was fixed at $5 million or more. Sun's motion also referred to Sellers' claim and stated that if BCI or the Committee did not challenge it, Sun would.[30] *(¶ 12, ftn. 4)* Sun Bachrach's claim was fixed in the amount requested, subject to the ability to challenge the secured nature of the claim.

---

30. Although Sun Bachrach managed to turn most of BCI's purchase price into a secured claim, its initial loan of $1.5 million, which occurred prior to the Harris loan, remains unsecured. Challenging Sellers' lien opens the door for Sun to recoup a big portion of its initial investment.

After repeated extensions of the challenge period, the Committee, Sun Bachrach and BCI reached a settlement. Filed on November 12, 2007, the settlement motion reported that $782,473.90 was held by the Committee for unsecured creditors, which came out of the $4,395.453.00 that BCI paid to Sun Bachrach. The Committee stated that while it believed it had a "colorable" claim against Sun, it was mindful of the costs of litigation"[31] and Sun had agreed to sweeten the sharing arrangement or "Subordinated Carve–Out." The motion explained that, for example, if Sun received $6 million from the estate, the unsecured creditors would get $1.75 million back from Sun. *(Docket # 488)* In the order approving settlement, the Debtor and the Committee covenanted not to sue "any of the Sun Entities and their direct or indirect partners or affiliates" or former officers, directors and employees, collectively referred to as the "Sun Parties". But—"To be clear, none of Edgar Bachrach or any member of his family, whether individually or as Collateral Agent, is included in the definition of "Sun Parties." *(Docket # 524, Exhibit 1, ¶ 10, pp. 8–9)*

Sun controlled BCI's bankruptcy so effectively that BCI's Chief Restructuring Officer, Larry Schechterman, hired by Alliance Management (which reported to Sun), had no idea why he agreed not to sue the Sun Entities:

Q. Why did the debtor give a release to the Sun entities in this matter for any cause of action against it?

A. I don't recall.

Q. What did the debtor receive in return for this covenant?

A. I don't recall.

Q. Why did the debtor carve out Ed Bachrach and his family from the release?

A. I don't recall.

Q. Did you at some point know?

A. I don't recall.

Q. You don't recall if at some point you knew?

A. Correct.

Q. Okay. So you, as the face, as the chief restructuring officer at Bachrach Clothing, Inc., it's your testimony under oath that you have no idea why the debtor gave a release to the Sun entities for no consideration in return; is that about right?

A. Correct.

*(Testimony of Larry Schechterman, Trial Transcript, Vol. 2 at 44–45)*

Sellers, who had yet to be sued, did not object to the settlement, possibly because their ability to challenge Sun's claim was preserved.[32] Nevertheless, one trade creditor, in a letter complaining about Sun's secured claim, dated January 5, 2007 *(Docket # 317)*, succinctly described Sun's successful tactics:

Your Honor,

We are trade creditors in this case. We understand that Sun Bachrach, LLC has filed a secured claim in this case for at least $5,463,554.70.

We wish to object to the amount and nature of this claim. As trade creditors

---

31. The cash collateral order prevented the Committee from using estate funds to challenge Sun's claim and if the Committee financed its own litigation and lost, Sun would get an administrative priority for its attorneys' fees.

32. Sellers changed counsel after BCI filed this fraudulent transfer action; Sellers' original bankruptcy attorneys did not object to most or all of the key orders favoring Sun Bachrach, but insisted on provisions in those orders which preserved Sellers' right to challenge Sun Bachrach's secured claim at a later date.

we were induced to extend credit to Bachrach Clothing, Inc. under the impression that Sun Bachrach's infusion of money represented a capital contribution. We would not have extended credit had we known that these monies were advances to be repaid at a later date. *It appears that Sun Bachrach is attempting to take two bites from the same apple. If Bachrach Clothing became profitable they would profit from their investment. If it failed they would get all their money back as secured creditors.*

We hope that you will take our objection into consideration when making your decision.

Very truly yours,

Paul Levin

Chief Financial Officer

Cullen, Inc.

(emphasis added)

Sun's final step was to encourage BCI to use most of the remaining estate funds to sue Sellers and Barsaled. After all, in its motion to liquidate the amount of its secured claim, Sun threatened that if BCI or the Committee did not sue Sellers, Sun would. A victory here would effectively refund to Sun its entire investment in BCI—after Sun ran it into the ground. This refund would come at the expense of Sellers who delivered BCI to Sun with assets in excess of liabilities and debt free. Sun positioned itself to pay very little for BCI by requesting Sellers to keep excess cash and real estate.[33] Following this reduced purchase price, Sun continued to minimize its risk by loaning money to BCI

and Holdings instead of making capital contributions. Sun, not Sellers, loaded BCI up with debt and liabilities. It brilliantly had two bites at the apple: big profits if it improved BCI's performance and a refund if it failed.

## Conclusions of Law

### 1. Fraudulent Transfer Elements and Burden of Proof

■ Debtor's complaint alleges avoidable fraudulent transfers by generally referring to § 548 of the Bankruptcy Code and Illinois' Uniform Fraudulent Transfer Act (740 ILCS 160/5 and 160/6). The Complaint did not allege any conscious or intentional effort by Defendants to defraud BCI's creditors, and there was no evidence at trial proving such intent. Debtor instead relies on the "constructive" fraudulent transfer provisions of both acts. The Bankruptcy Code provides in part:

§ 548. Fraudulent transfers and obligations

(a) (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to

---

**33.** The suggestion in some of BCI's court papers that its real estate and cash were transferred to Sellers for no consideration is curious. Sellers owned BCI. If a seller owns a house with an adjacent farm and the buyer decides he only wants the house, seller keeps the farm and buyer pays less for just the house. Seller does not have to "buy" the farm back to retain it as debtor suggests. The analogy applies here. Sun wanted Sellers to keep the real estate and excess cash so it could invest much less to buy BCI. Sellers owned 100% of BCI. They did not have to give consideration for removing real estate and cash from the sale to Sun.

which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

. . . .

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title [11 U.S.C. §§ 544, 545, or 547], a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Subsections (a)(1)(B)(i) and (ii) of the Bankruptcy Code are applicable here. Essentially, BCI's transfers to Sellers may be avoided if BCI did not receive something of reasonably equivalent value, and if the transfer was made while BCI was insolvent, or the transfer rendered BCI insolvent or left BCI undercapitalized. The same tests are at play in the Illinois provisions, which state in part:

§ 740 ILCS 160/5. [Transfer or obligation; creditor's claim arising before or after transfer]

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

§ 740 ILCS 160/6. [Transfer or obligation; creditor's claim arising before transfer]

Sec. 6. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insol-

vent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

The constructive fraud subsections of the Illinois statute consist of 740 ILCS 160/5 (a)(2) and 160/6(a), quoted above.

■ Distilling both statutes down to the issues disputed in this case, BCI had the burden to prove: 1) It made a transfer for which it did not receive reasonably equivalent value; and 2) the transfer was made while BCI was insolvent or rendered insolvent by the transfer or the transfer resulted in insufficient capital. *See Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 948–49 (7th Cir.2007) (Plaintiff has burden of proof); *Baldi v. Samuel Son & Co.*, 548 F.3d 579, 581 (7th Cir.2008) (Illinois and bankruptcy fraudulent transfer statutes require proof of the same elements, except the older version of § 548 of the Bankruptcy Code required the action to be brought in shorter time period). Debtor must prove elements of the fraudulent transfer by a preponderance of the evidence. *See Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 778 (Bankr.N.D.Ill.2007).

The first element, whether BCI made a transfer for which it did not receive reasonably equivalent value, is straightforward since the transaction involved money and debt in exchange for BCI's stock.[34] If the value of the company's stock was reasonably close to the price paid by Sun, there is little controversy. Neither party separately argued this issue, realizing that the real basis of their dispute was the value of BCI for purposes of proving insolvency or undercapitalization—the second element. If BCI was not insolvent or undercapitalized, it is unnecessary to reach the reasonably equivalent value issue.

## 2. Collapsing Transactions Before and After the Sale to Sun

Prior to addressing whether BCI was insolvent or undercapitalized it is necessary to identify what parts of the sale transaction should be analyzed. BCI's post trial brief states: "As with many fraudulent conveyance cases involving a LBO, this Court must first collapse the component parts of the LBO.... '[A] court should not focus [sic] on the formal structure of the transaction, but rather on the knowledge or intent of the parties involved in the transaction.'" *BCI Brf. at 3 and n. 4, quoting Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 502 (N.D.Ill. 1988). BCI hopes that collapsing the transactions before, during and after the sale into one deal makes Sellers responsible for Sun's actions. Debtor complains

**34.** Part of the stock purchase transaction might be considered a "settlement payment" and protected from avoidance under the safe harbor clause of 11 U.S.C. § 546(e), since money for the purchase of BCI was wired from Harris Bank, a financial institution. See Irina V. Fox, *Settlement Payment Exception to Avoidance Powers in Bankruptcy: An Unsettling Method of Avoiding Recovery from Shareholders of Failed Closely Held Company LBOs*, 84 Am. Bankr. L.J. 571 (Fall, 2010). However, this defense was not asserted by

' Defendants at trial or in their post trial briefs. After the court mentioned that the issue was not raised in the post trial briefs, Defendants sought to file a supplemental brief asserting the safe harbor defense. The court sustained BCI's objection on the basis that Defendants' failure to assert the issue at trial prejudiced BCI because it may have been able to present evidence refuting characterization of the stock purchase transaction as a settlement payment. Accordingly, the court makes no ruling as to the applicability of this defense.

about Sun's use of an LBO, which enabled Sun to limit its capital contribution to $500,000 in equity and a $1.5 million loan to Holdings. After highlighting Sun's $500 million fund, Debtor remarks that Sun was able to purchase BCI with less than 0.4% of its fund by generously relying on debt. "Appropriately viewed as a collapsed transaction, nearly 94% of the stated $8 million purchase price was funded by $7.5 million of new debt." *BCI Brf. at 4.* However, as Defendants correctly point out, BCI cannot win if the transactions before and after the sale are not collapsed:

> On February 15, 2005, when the Bachrachs turned over ownership of BCI to Sun, the company had zero balance sheet debt. Tr. V at 178:6–13. According to the McGladrey audited opening balance sheet that *included* a post-hoc $3.1 million downward adjustment to the value of the inventory, BCI *still* had about $10 million in working capital and about $8 million in total stockholder's equity. Tr. III at 240:17–23. If the transactions that occurred on or around February 15, 2005, particularly the debt that Sun caused BCI to incur *after* the Bachrachs relinquished control, are not collapsed into one transaction, this case is over before it starts.

*Def. Brf.* at 3.

The only source declaring BCI insolvent and undercapitalized is Debtor's trial expert, Craig Elson, of LECG, LLC. His opinion includes the LBO transactions Sun engineered after the Bachrachs turned BCI over to Sun. His report clearly relies on the combined actions of Sellers and Sun. "Counsel for BCI has asked me to evaluate the financial impact on BCI of the LBO transaction and determine whether, *as a result of the LBO transaction,* BCI was rendered insolvent, unable to pay its debts as they matured and/or was left without adequate capital." *(Report of Craig T. Elson, DX 117 at 2,* emphasis added) Elson does not opine on whether

just the pre-closing real estate conveyance to Barsaled and/or cash withdrawal doomed BCI. His opinion also includes the buyer's liability (Holdings) to the Bachrachs as a one hundred percent liability of BCI, effectively disregarding the formal structure of the sale. BCI's expert's opinion is relevant only if the sale and LBO are collapsed. Defendants are correct that this case is over if the transactions are not collapsed into one deal.

■ "The 'collapsing' doctrine is essentially an equitable doctrine allowing a court to dispense with the structure of a transaction or a series of transactions." *In re Route 70 & Massachusetts, L.L.C.,* No. 09–14771, 2011 WL 1883856, at *5, 2011 Bankr.LEXIS 1815, at *15 (Bankr. D.N.J. May 17, 2011); *In re Ginn–La St. Lucie Ltd.,* No. 08–29769, 2010 WL 8756756, at *4–5, 2010 Bankr.LEXIS 6324, at *23–25 (Bankr.S.D.Fla. Dec. 10, 2010). In *Boyer v. Crown Stock Distribution, Inc.,* 587 F.3d 787 (7th Cir.2009), the Seventh Circuit concluded that a $3.3 million payment in a leveraged buyout violated Indiana's Uniform Fraudulent Transfer Act. *Id.* at 793–94. The court did not offer a specific test for determining when a series of transactions in a leveraged buyout should be collapsed, but stated that: "[T]he 'equities,' as we shall see, do not favor lenient treatment in this case." *Id.* at 792–93. The court went on to explain that "the critical difference between the LBO in this case and a bona fide LBO is that this LBO was *highly* likely to plunge the company into bankruptcy." *Id.* at 793.

The *Crown* decision is best understood by studying the bankruptcy court's findings of fact. Buyer Smith agreed to pay sellers $6 million for a business he *and the sellers knew* was worth no more than $2.7–$3 million as a going concern. Buyer also invested only $500 of his own money. Virtually all the purchase price, double the

business' value, was obtained by loans secured with the company's assets. The sellers' knowledge that they received at least $2 million more than the business was worth "significantly weakens the benefits that may come from the good faith determination." *In re Crown Unlimited Machine, Inc.,* No. 03–13400, 2006 WL 6401548, at *8, 2006 Bankr.LEXIS 4651, at *25 (Bankr.N.D.Ind. Oct. 13, 2006). The debtor was doomed to failure following the transfer because of the excessive purchase price and the debt associated with it. *Id.* at *9–10, 2006 Bankr.LEXIS 4651, at *29. On appeal, the district court added: "Crown Unlimited's financial statement prepared on December 31, 1999, listed total assets at $3,750,609 and total liabilities at $1,780,935. After the sale, Crown Unlimited had total debts of $7,504,878 and $811,000 in its bank account to maintain operations. The amount of available capital didn't cover the company's existing trade debt or customer deposit liability, which amounted to $1.5 million . . . ." *Boyer v. Crown Stock Distrib., Inc.,* No. 06 C 409, 2009 WL 418275, at *3, 2009 U.S. Dist. LEXIS 12393, at *10 (N.D.Ind. Feb. 17, 2009).

The Northern District of Illinois has also weighed in on the collapsing issue. The court denied a motion to dismiss where it was alleged that the board and insider shareholders knew that the transaction was intended to be an LBO, knew that the company was insolvent before the LBO, and that the LBO would result in further encumbrance of the company's already encumbered assets. *Wieboldt,* 94 B.R. at 502–03. However, the court declined to collapse the transaction as to non-insider shareholders who were not alleged to have known details of the transaction. *Id.* at 503. Thus, the court's focus was on the knowledge and intent of the non-insider shareholders. *Id.* In so holding, the court explained that the drafters of the Bankruptcy Code intended to shield "innocent recipients" of property in the fraudulent conveyance context. *Id.*

Other courts, including several in the Third Circuit, have had occasion to consider the collapsing of a series of transactions. *See HBE Leasing Corp. v. Frank,* 48 F.3d 623, 637 (2d Cir.1995) (collapsing transactions where there was evidence sufficient to constitute constructive knowledge of fraudulent scheme); *Kupetz v. Wolf,* 845 F.2d 842, 850 (9th Cir.1988) (declining to collapse LBO where sellers did not sell in order to defraud creditors, they did not know buyer intended to leverage the company's assets, and the transaction had indicia of a straight sale); *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1302–03 (3d Cir.1986) (collapsing transactions where all parties participated in loan negotiations); *In re Nat'l Forge Co.,* 344 B.R. 340, 350–51 (W.D.Pa. 2006) (viewing a stock redemption as an integrated transaction considering strong identity of interests among the parties involved, joint involvement in arranging financing, and close timing of the transactions); *In re OODC, LLC,* 321 B.R. 128, 138 (Bankr.D.Del.2005) (denying motion to dismiss where trustee alleged entire series of asset purchases and transfers was orchestrated with the intent to defraud the debtor and its creditors); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.),* 284 B.R. 355, 372–73 (Bankr. S.D.N.Y.2002) (granting motion to dismiss and refusing to collapse transactions where there were no allegations lenders knew or avoided discovering that purchase price of the acquisition was not valued fairly, that the debtor was insolvent, or that it would be rendered insolvent as a result of the transaction).

█ Most courts agree that the focus should not be on the formal structure of a transaction, but on the knowledge and in-

tent of the parties. *See Wieboldt,* 94 B.R. at 502; *HBE Leasing,* 48 F.3d at 635–36; *Kupetz,* 845 F.2d at 847–48; *Nat'l Forge,* 344 B.R. at 348; *Sunbeam,* 284 B.R. at 370. *See also* 5 Collier on Bankruptcy ¶ 548.03[6] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) ("[I]n leveraged buyouts, courts tend to collapse or disregard value received in the form of promises from a newly-formed entity created for the transaction, especially when the transferees had actual or constructive notice regarding the form of the transaction."). In particular, courts look to whether there was an "overall scheme to defraud creditors." *See Nat'l Forge,* 344 B.R. at 348, *citing HBE Leasing,* 48 F.3d at 635–36; *see also OODC,* 321 B.R. at 138; *Sunbeam,* 284 B.R. at 370.

▮ Whether an LBO should be collapsed is a fact-intensive inquiry and should be determined on a case-by-case basis. *Sunbeam,* 284 B.R. at 370. Some courts find constructive knowledge where the transferee fails to make appropriate inquiries with the information that would have been gained from ordinary diligence while others require an active avoidance of the truth. *See HBE Leasing,* 48 F.3d at 636; *Sunbeam,* 284 B.R. at 371. Another court required actual intent to defraud and would collapse a transaction where, taken as a whole: (1) the transactions diminish the value of the debtor's estate and the transfer is (a) for less than fair consideration or (b) made by the debtor with actual fraudulent intent; and (2) the party from whom recovery is sought had actual or constructive knowledge of the entire scheme. *In re Allou Distribs., Inc.,* 379 B.R. 5, 22 (Bankr.E.D.N.Y.2007). Still other opinions emphasize the interdependence of the transactions:

In assessing a collapsing claim, a court must focus on the interdependence of the multiple transactions and whether the participants knew or should have known that no transaction would occur unless all of the other transactions occurred. *See Voest—Alpine [Trading USA Corp. v. Vantage Steel Corp.],* 919 F.2d [206] at 212 [ (3d Cir.1990) ] (collapsing transactions where each part of the transaction was dependent on the occurrence of the other and the defendant would not have consented to one of the transactions if the other would not occur); *Official Committee of Unsecured Creditors v. Clark (In re National Forge Co.),* 344 B.R. 340, 348 (W.D.Pa. 2006) ("Among other things, courts consider whether all of the defendants were aware of the multiple steps of the transaction [and] whether each step would have occurred on its own or, alternatively, whether each step depended upon the occurrence of the additional steps in order to fulfill the parties' intent."); *Hechinger Inv. Co. of Delaware v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.),* 327 B.R. 537, 546–47 (D.Del. 2005) (collapsing transaction where the defendants knew about the multiple steps of the transaction, each step of the transaction would not have occurred on its own, and each step relied on additional steps to fulfill the parties' intent); *Sher v. SAF Fin., Inc.,* Civ. Action No. RDB 10–1895, 2010 WL 4034272, at *7 (D.Md. Oct. 14, 2010) (same); *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913, 934 (S.D.N.Y.1995) (collapsing LBO where no single transfer would have taken place without the expectation that the entire transaction would be consummated, and the parties were aware of the overall LBO).

*In re Fabrikant & Sons, Inc.,* 447 B.R. 170, 187 (Bankr.S.D.N.Y.2011).

▮ *In re Jevic Holding Corp.,* No. 08–11006, 2011 WL 4345204, 2011 Bankr.LEXIS 3553 (Bankr.D.Del. Sept.

15, 2011) involved an LBO *also* structured by Sun. As in the instant case, Sun purchased the debtor with the help of a $90 million bridge loan from Harris Bank secured with debtor's assets and guaranteed by Sun. After the closing, CIT Group replaced the Harris loan with a larger financing facility of $101.2 million, similar to LaSalle's role in this case. The court observed "Jevic was almost immediately in default of various provisions of the Refinancing Facility." *Id.* at *1, 2011 Bankr.LEXIS 3553, at *5. To reduce debtor's liability, CIT successfully pressured debtor into selling and leasing back its real estate. This dropped the loan balance to $55 million. Sun's maneuvers in Jevic resemble this case.[35] These similarities, plus the quantity of Third Circuit cases with specific guidelines on the collapsing doctrine, favors use of the test summarized in *Jevic*:

> The courts in this District have considered the following factors when assessing whether the parties to the transactions sought to be collapsed had the requisite knowledge and intent to warrant consideration of the asserted transactions in the aggregate: whether all parties involved in the individual transactions had knowledge of the other transactions; whether each transaction sought to be collapsed would have occurred on its own; and whether each transaction was dependent or conditioned on the other transactions.

*Id.* at *5, 2011 Bankr.LEXIS 3553, at *18–19.

 BCI failed to establish that the Bachrachs' sale to Holdings was dependent or contingent on Sun structuring it as an LBO. Quite the opposite was true. Sun's January 2005 letter of intent announced it would purchase BCI from Sellers *without any financing contingency*:

> New investments are being made through Sun Capital Partners III, a $500 million investment fund raised in January 2003 (together the "Fund"). Debt financing will either be provided by a lending institution with which we have an established relationship or will be funded by Acquisition at closing should the lenders not be ready to close at the same time as the Company and Acquisition. Acquisition will *not* have a financing contingency associated with this transaction.

*(JX 068 at 2*, emphasis in original*)*.

Sun highlighted that it could close rapidly, precisely because its purchase would not be dependent on debt: "Sun Capital is uniquely positioned to close transactions within this relatively short time frame *due to our ability to close deals without external financing. . . .*" *(Id. at 5)* The letter also boasted about Sun's financial strength, noting that if its portfolio of investments were consolidated, it would rank within the top 100 of *Forbes Magazine's* largest U.S. companies. All of this led Ed Bachrach to believe that Sun was more than able to complete the sale and continue to run BCI by paying its obligations as they became due, as had always been the case with BCI up to Sun's purchase. This is in stark contrast to the *Crown* case where sellers knew buyer was paying twice the amount the company was worth and the buyer's "assets were meager." 587 F.3d at 790. Under such circum-

---

**35.** Two things differed: 1) At the outset Sun requested that the Bachrachs keep BCI's excess cash and real estate to reduce the sales price and resulting debt on BCI's assets; and 2) Sun, the beneficiary of a broad covenant not to sue, is not a defendant here. In exchange for a small percentage of the money Sun is paid on its secured claim, the Committee elected not to sue Sun. BCI also agreed not to sue Sun, although its designated officer, Larry Schechterman, had no idea why BCI released Sun. In any event, no party pressed an objection to the proposed settlement and covenant not to sue.

stances it is easy to conclude that the sellers knew or should have known the sale would injure Crown's creditors. On the other hand, the facts in this case were that the purchase price of BCI was "attractive" and below book value, as noted in KPMG's due diligence. There was no evidence at all that the purchase price of BCI was too high. There was no evidence at all that Sun conditioned its purchase on the LBO. Sun stressed to the Bachrachs that it could finance the deal itself if it wanted to. Clearly, Sun committed to buy BCI independent of *any* financing conditions. Sun did not inform the Bachrachs that an LBO must occur or no deal. Accordingly, the sale transaction was not dependent on the LBO Sun later designed.

This case is also unlike *Wieboldt* where allegations that the controlling shareholder and board assisted in structuring an LBO, knowing that Wieboldt was insolvent and in default on its obligations, stated a claim to collapse the LBO transactions. 94 B.R. at 495, 502. Here, the Bachrachs delivered to Sun a company with assets exceeding liabilities by several millions of dollars and without any long term debt. Moreover, the Bachrachs agreed to refund part of the purchase price to guarantee that BCI had at least $10,235,000.00 in working capital, which Ed testified was sufficient to run the company and no one disputed. The LBO in *Wieboldt* left the company with no working capital, while the sale terms in this case ensured enough capital would exist to run BCI. None of the facts here would have put the Bachrachs on actual or constructive notice that their sale to Sun would injure BCI's creditors.

Nevertheless, BCI argues that three events prove Sellers consciously participated in a plan to defraud creditors: 1) Ed's handwritten notes; 2) pledge of BCI's assets to secure the Holdings note; and 3) signing of the closing documents. None of these establish intent to defraud creditors.

Regarding the first item, Ed consulted a number of professionals and investment bankers before selling BCI to Sun, in an effort to either sell BCI or bring in management who would permit him to pursue a different career in academics. His handwritten notes from these encounters include one that listed the elements of a fraudulent conveyance *(PX 4)* and another that said "Draw out cash and let them continue for 2 years on bank debt so our draw is not a preference payment." *(PX 6)* However, Ed testified that he did not recall the specific context in which he jotted these notes, but he typically records what other people say. These notes, some written two years before the sale to Sun, establish nothing. Indeed, consultants would not be doing a good job if they did not point out pitfalls such as fraudulent conveyance elements or preference risks to clients looking to transition out of a business. One could just as easily assume that Ed's education about bankruptcy and liquidation was one of the reasons why he continued to look for a strong buyer, assumed risk by financing one half of the purchase price with a subordinated note, and agreed to adjust BCI's purchase price to ensure sufficient working capital after the sale. There is no evidence that these notes reflected Ed's thinking much less a strategy to defraud BCI creditors.

As for the pledge of BCI's assets to secure the Holdings note, it was Sun, in the letter of intent, who initially suggested that the $4 million financed by the Bachrachs be secured by a "[s]econd lien position subject to a subordination agreement." *(JX 068 at 1)* Since it turned out that Holdings' only asset was going to be the stock of BCI, Ed's request that the note be secured with a junior lien in BCI's assets was a prudent business decision, given the risk already assumed in financing one half of the purchase price. Sellers should not be required to perpetually in-

sure the success of a business if it is sound financially when sold. Moreover, if seeking a lien is evidence of fraud against unsecured creditors, it is puzzling why BCI gave a pass to Sun. Sun purchased the $2 million Harris loan, which it guaranteed, and used Harris' security agreement to hoist its $5 million investment ahead of BCI's unsecured creditors. This was done when BCI was clearly in trouble, having used up its borrowing base. Yet, during this bankruptcy, the debtor has repaid Sun almost all of its investment in BCI.

Even if Ed's note taking and lien request were proof of fraudulent intent, BCI has not produced anything to suggest his sisters, Barb and Sally, were in on the alleged scheme. BCI, however, argues that their signatures on the closing documents are enough to hold Ed, and his sisters, responsible for the Sun LBO. This court has laboriously reviewed all 51 documents included in the 684 page closing binder prepared by Sun's attorneys, Kirkland and Ellis. None of the closing documents signed by Barb and Sally reveal anything about an LBO. As secretary of BCI, Barb signed document 21, which certified BCI's articles of incorporation, bylaws and corporate resolution to sell the stock. Document 22, signed by Ed, Barb and Sally was a certification of non-foreign status. They all signed document 38, which was the exchange of BCI stock for a minority interest in Holdings and document 40, a stock registration agreement. None of these papers disclosed any details about the LBO or how Sun planned to fund the purchase. The Stock Purchase Agreement was the final document signed by all three Sellers. It contained no information about the planned LBO. This certainly was no surprise, since Sun committed to purchase BCI whether it had financing or not.

Ed clearly was more involved than his sisters, but there was no evidence to suggest that he was aware that Sun planned to finance nearly all its purchase or do an LBO. His testimony was uncontroverted, and this court found that he was not involved in structuring any part of the Sun acquisition. He only became aware that BCI was taking on debt when he signed the flow of funds statement, one of the last documents he saw at the closing. He testified that he had no discussions with Sun about their planned financing. He had no role in separately incorporating the buyer, Holdings, or any of the key steps used to implement the LBO. Not one Sun employee, or any witness, testified that they disclosed their LBO plans to Ed.

Accordingly, neither Ed's handwritten notes, his request to secure the subordinated note with a junior lien in BCI's assets, nor the signing of closing documents proved actual intent to defraud creditors by Ed or his sisters.

Even if a "constructive" test is used to determine fraudulent intent, there were no red flags to put the Bachrachs on notice that the sale of BCI to Sun would injure creditors. BCI took a large mark down of inventory prior to the sale to address inventory issues that were identified in Sun's projections. Despite this mark down, the Bachrachs delivered the company to Sun debt free and solvent by millions of dollars. They agreed to refund the purchase price to the extent that BCI's actual working capital was less than a target amount required to run the company. They in fact refunded over a half million in cash a few months after the sale. BCI also benefitted from a below market warehouse lease, compliments of a math error Ed made, but honored. Sun was a strong company that boasted it could do this deal on its own, without a bank. The LBO was not a condition to the sale. Not one witness, Sun or otherwise, testified that Sun would scuttle the sale without LBO financing. Whatev-

er Sun's internal concerns were, they were not expressed to the Bachrachs. The evidence fails to establish any inter-dependency between the sale and the LBO. The evidence fails to establish any knowledge, constructive or otherwise, on the part of Sellers about how Sun would finance the purchase. Finally, the evidence fails to establish any intent of the Sellers to defraud BCI's creditors. Accordingly, the collapsing doctrine will not be applied to impose the harm of Sun's actions on the Bachrachs.

**The LBO Did Not Render BCI Insolvent or Undercapitalized**

▮ BCI's failure to present sufficient evidence to collapse the separate sale and LBO transactions ends its fraudulent conveyance case.[36] This is because Craig Elson's opinion that the sale left BCI insolvent and undercapitalized was based on the combined effect of the sale and LBO on February 15, 2005. However, even if this court were to collapse the transactions, Elson's opinion was not persuasive. Insolvency is a question of fact. *Baldi v. Samuel Son & Co. (In re McCook Metals, L.L.C.)*, No. 05 C 2990, 2007 WL 4287507, at *4–5, 2007 U.S. Dist. LEXIS 89412, at *17 (N.D.Ill. Dec. 4, 2007), *quoting Plankinton Bldg. Co. v. Grossman*, 148 F.2d 119, 125 (7th Cir.1945) ("It is next contend-

ed by appellants that the court erred in holding that the debtor was unable to meet its maturing debts, and that it was insolvent. These are questions of fact."). *Accord, Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Communs. Corp.)*, 493 F.3d 345, 384 (3d Cir.2007) ("Whether a corporation is insolvent, and when it becomes so, are issues of fact.").[37] The burden was on BCI to prove insolvency and/or inadequate capitalization by a preponderance of the evidence. That burden never shifts. *Baldi*, 2007 WL 4287507, at *3–4 n. 9, 2007 U.S. Dist. LEXIS 89412, at *13 n. 9.

▮ BCI offered the testimony and report of Craig T. Elson, Senior Managing Director of LECG, LLC. *(Rpt. at PX 9 and rebuttal at PX 10)* Defendants presented rebuttal testimony of John D. Ciancanelli and a report he co-authored with Stan A. Murphy, both of Navigant Consulting, Director and Managing Director, respectively. *(Rpt. at DX 106 and rebuttal at DX 105)* Ciancanelli and Elson each have done hundreds of business valuations. The parties stipulated to their qualifications, although BCI's counsel felt it necessary to point out that this was Ciancanelli's "maiden testifying voyage."[38] *Pl. Post–Trial Rebuttal Brf. at 1.* In addition to their other qualifications, Ciancanelli and

---

**36.** Count 13 alleges Sellers breached their fiduciary duty in selling BCI. Counts 14 and 15 are moot as to the Bachrachs, who withdrew their proofs of claim after the trial. Technically, Barsaled still has a claim that BCI could seek to subordinate or disallow. No additional evidence was presented to support these counts, however, other than the allegation that the LBO left BCI insolvent and undercapitalized. To the extent any portion of the case remains, the court will rule on the insolvency and capital condition of BCI as an independent basis for judgment in favor of Defendants.

**37.** This section on BCI's alleged insolvency and undercapitalization constitutes additional

findings of fact under Bankruptcy Rule 7052. Because it involves an analysis of the parties' expert opinions, it is discussed separately.

**38.** If this was an effort to reduce Ciancanelli's credibility, it failed. Ciancanelli's qualifications show that most of his valuations were done to guide business decisions in the real world, while Elson's experience consisted primarily of expert opinions for litigants. See Elson Report, PX 9, Attachment B, where Elson lists his work in 76 contested cases. The fact that Elson is an experienced witness does not elevate his valuation skills over Ciancanelli's.

Murphy are both Certified Public Accountants while Elson is not. Although neither expert's approach was always consistent,[39] Ciancanelli offered credible and convincing explanations of why he chose certain parameters. Elson's opinions walked a thin line between expert and advocate. His view was based too much on Sheila Arnold's questionable assessment of BCI's inventory, hindsight analysis, and dismissal of BCI's contingent assets. Elson often failed to explain the logic behind his choices, ignored actual market conditions and shifted his trial testimony away from some of the positions taken in his deposition. The court came away with the conviction that Elson was just trying too hard to get to the conclusions that BCI needed to win its case.

## Insolvency

### 1. BCI's Enterprise Value

■ Insolvency is defined by the measure of liabilities against enterprise worth. *Contested Valuation in Corporate Bankruptcy: A Collier Monograph,* ¶ 1.01 (Robert J. Stark et al. eds., 2011) The asset side of the analysis, or enterprise value of BCI, is considered first. In calculating BCI's enterprise value, Elson disregarded the consolidated balance sheet, audited by McGladrey & Pullen, in favor of using the discounted cash flow method to value BCI.[40] Assuming his approach was the only correct one to take, and assuming all of the parameters he selected were correct, Elson concluded that at the time of sale, the enterprise value of BCI was either a positive $1,163,520.00 or a negative $293,350.00. *(PX 9 at Exh. 1.0)* The negative enterprise value was based on including BCI's post-sale obligation to pay Sun $400,000 a year in management fees. However, BCI employed managers, including the CEO Arnold and head of merchandising Larry Schechterman. Inclusion of the management fees was not a reasonable approach if BCI was to be valued with a hypothetical purchaser in mind.[41] There was no evidence that every purchaser would exact a management fee like Sun. Additionally, a negative enterprise value implies that the Bachrachs should have paid Sun to purchase their business. *(Ciancanelli/Murphy Rebuttal Report, DX*

**39.** Take sample size and resulting statistical significance as an illustration: Elson picked the larger sample size when he looked back to 1926 to calculate an equity risk premium. Ciancanelli only looked back 50 years, which is less data. However, Elson selected the smallest sample size of the Ibbotson's 10b decile for his size premium, while Ciancanelli elected the larger sample size in the Microcap group. Ciancanelli criticized Elson for using too small of a sample size when calculating the size premium and Elson criticized Ciancanelli for using a too small of a sample size when calculating the equity risk premium. Another example was the use or non-use of comparable companies. Elson did not use a market approach to valuation because he felt there were no companies comparable to BCI, but he did use industry standards to establish debt and equity ratios instead of BCI's actual capital structure. He criticized Ciancanelli for using BCI's actual capital structure instead of comparable companies. But when Ciancanelli did use comparable companies to determine the exit multiple for a terminal growth rate, Elson complained.

**40.** BCI's parent company, Holdings, had no assets other than BCI, so the assets reported in the audited balance sheet were BCI's.

**41.** This is another example of Elson's inconsistent approach. He criticized Ciancanelli for using BCI's specific capital structure instead of an industry average because the enterprise should be valued for a hypothetical purchaser. Yet, he incorporated management fees, a feature unique to this particular sale to Sun, in arriving at the Weighted Average Cost of Capital, a significant valuation component. *(Elson Testimony, Trial Transcript Vol. 3, at 56)*

*105 at p. 3)* For these reasons, the negative value is unreasonable.

## 2. BCI's Liabilities

 Instead, if Elson's alternative, positive value of $1,163,520.00 is used as a starting point, BCI's liabilities need to be identified and subtracted from his enterprise value to determine BCI's solvency. Elson subtracted two items: the $2 million loan from Harris [42] and the $4 million owed to Sellers by BCI's parent, Holdings. Elson did not discount either of these liabilities, and Defendants correctly assert that discounts should have occurred. In *Baldi*, Judge Posner observed:

> To establish Longview's insolvency at its starting date, Myhran jacked up its liabilities from the $206 million shown on the company's balance sheet to $367 million. He did this by adding contingent liabilities, including a contingent pension liability, contingent post-retirement benefit obligations, contingent severance payments, and the penalty provision in a take-or-pay contract with Bonneville. Contingent liabilities are—contingent. "By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199 (7th Cir.1988); see, e.g., *Freeland v. Enodis Corp.*, 540 F.3d 721, 730 (7th Cir.2008); *In re Chase & Sanborn Corp.*, 904 F.2d 588, 594 (11th Cir.1990). Myhran treated Longview's contingent liabilities as certainties. That invalidated his expert opinion. *In re Wallace's Bookstores, Inc.*, 316 B.R. 254, 260–62

(Bkrtcy.E.D.Ky.2004); *see FDIC v. Bell*, 106 F.3d 258, 264–65 (8th Cir.1997).

548 F.3d at 582.

Judge Posner used an example applicable here: "The pension liability was not Longview's liability; it was the liability of companies affiliated with Longview. It would become Longview's liability only if the affiliates defaulted on their pension obligations, and Myhran offered no estimate of the probability of such an event." *Id.* at 583. The $4 million subordinated note that Elson fully charged against BCI was the liability of its parent, Holdings, a company formed by Sun in connection with its purchase of BCI:

> Q. The debtor didn't owe any money whatsoever to either Ed Bachrach, as seller's agent, or to any of the sellers individually?
>
> A. No, it was an obligation of Bachrach Clothing Corporation, parent.

*(Testimony of Elson, Trial Transcript, Vol. 3 at 135)*

Elson testified that he included the liability at a hundred percent because the Holdings note was secured by a junior lien on BCI's assets. At trial, Elson was asked if the Holdings debt did not exist, would the value of the junior lien on BCI assets be zero. He attempted to equivocate, but in a video clip of his deposition he did not:

> Q. So if the obligation from BCHC to the sellers did not exist, then the value of the security interest would be zero; isn't that correct?
>
> A. If the obligation didn't exist? Correct.

*(Id. at 138–139)*

After that clip, Elson was further questioned at trial:

---

**42.** During the trial this loan was also referred to as the $1.9 million loan. Closing costs were taken out before the funds were paid to

BCI. For consistency, the court will refer to this loan as the $2 million Harris loan.

Q. If there is some reason why the underlying obligation from BCHC to the sellers cannot be enforced, that would render the contingent liability to zero instead of 4 million?

A. If we define the contingent obligations as the security agreement—or the security interest, I would agree.

*(Id. at 144)*

Although not an attorney, Elson tried to insist during the trial that the junior lien was somehow independent of the note it secured. He admitted he did not have an attorney look at the issue. Defendants are correct; if they could not enforce the note, Elson could not use the junior lien to somehow resurrect all of Holdings' $4 million debt and add it to BCI's liabilities.

The $4 million note's terms stated that the note could not be enforced as long as Holdings had "Superior Debt." Elson admitted at trial that Holdings owed Sun $1.5 million which it did not pay. He also testified: "I would agree with the characterization that superior debt would include the $1.5 million note we were talking about before." *(Id. at 149, 152)* Elson further agreed that Holdings' failure to pay Sun the $1.5 million would constitute a "blockage event" that would prohibit Sellers from enforcing their subordinated note.

*(Id. at 152–153, 192)* So, if BCI was in financial difficulty, as Elson maintains, Holdings might not be able to pay Sun the $1.5 million. This would block Sellers from enforcing their note. While Elson curiously continued to insist (without the help of an attorney) that the lien had a life of its own, it does not. *(Id. at 152–153)* Elson erred when he valued the $4 million debt of Holdings as a 100% liability of BCI.[43] At a minimum, the liability should have been discounted. His failure to do so discredits his valuation of BCI. *See Harris Bank, N.A. v. Werner (In re Werner)*, 410 B.R. 797 (Bankr.N.D.Ill.2009) and authorities cited therein.[44]

The $2 million Harris loan liability was also incorrectly valued at one hundred percent for two reasons. First, Sun was effectively a co-obligor on the Harris loan by virtue of the breadth of its "Guaranty." Second, if BCI was insolvent, it had a potential claim against Sun directors for improperly declaring a dividend. This claim could offset nearly all of the Harris liability. Both of these factors should have caused Elson to meaningfully discount the $2 million Harris liability.

 As to the first reason, the facts support a conclusion that Sun was actually a co-obligor instead of a guarantor on the

---

43. BCI argues that Bachrachs talk out of both sides of their mouth when they assert the $4 million subordinated note is unenforceable, because they filed a proof of claim against BCI (now withdrawn) for that amount and also asked for adequate protection to safeguard their junior lien. However, only BCI argues the Sale/LBO rendered it financially distressed. Bachrachs maintain that BCI was not insolvent. So, under the Bachrachs' view it would be possible that Holdings could have paid Sun and there would be no blockage event. On the other hand, the note and lien clearly become worthless if BCI is insolvent. As Elson acknowledged, Holdings would have no assets to pay Sun and this would trigger the blockage event. *(Testimony of Elson, Trial Transcript, Vol. III at 144–145)* The Ba-

chrachs are not inconsistent in their arguments.

44. In calculating his enterprise value, Ciancanelli probably should have assigned some contingent liability to the lien securing the $4 million note issued by BCHC to sellers. Under Elson's analysis that BCI is insolvent, there is a clear blockage event. If BCI was not insolvent, some discounted amount should have been included to account for pay off of superior debt. However, there was sufficient enterprise value ($6 million) under Ciancanelli's calculation to offset the discounted contingent liability resulting from the lien. Also, the contingent liability could be offset somewhat by the contingent asset of BCI's loan to BCHC (the dividend dispute).

Harris loan. Looking at the "Guaranty," Sun's promise to pay Harris was unconditional. BCI did not need to be in default on the Harris loan nor could Sun assert any BCI defenses. Harris could collect the amount due from Sun without seeking payment from BCI first. Disregarding the title "Guaranty" and elevating substance over form, Sun's promise was actually a direct or primary obligation, as opposed to a traditional guaranty, no matter what the title of the document. *(DX 1 at pp. 204–207)* "It is unlikely that the Code makes big economic effects turn on the parties' choice of language rather than the substance of their transaction; why bother to distinguish transactions if these distinctions can be obliterated at the drafters' will?" *United Airlines, Inc. v. HSBC Bank USA, N.A.,* 416 F.3d 609, 612 (7th Cir.2005).

Sun's promise to pay Harris was not a conventional "Guaranty," regardless of what Sun and Harris wished to call it. Its terms effectively made Sun a co-obligor and/or jointly liable with BCI on the debt. Under such circumstances, it was error for Elson not to value the Harris liability at a discount. In a similar situation, the Seventh Circuit held:

> We need not determine whether the Bank forfeited its argument about the right way to value contingent liabilities, because there is an even more glaring error: contingent liabilities must be matched against contingent assets.
>
> *The missing asset was Desnick's wealth.* If Desnick caused the Hospital to submit excessive claims for federal payments, then he and the Hospital were jointly and severally liable for restitution. So if $18.5 million goes on the liability side of the Hospital's balance sheet, *the asset side must contain an estimate (as of mid–1997) of how much Desnick would chip in, either directly or via contribution or indemnity (for, if the Hospital paid, then it would have a claim against*

*Desnick).* As it happened, Desnick paid the whole $18.5 million out of his own resources. Paloian contends that none of the money that Desnick supplied belonged on the asset side of the balance sheet as of mid–1997, because it was speculative how much he could or would pay. *Yet Desnick's personal wealth is not pie in the sky; it is the sort of thing that banks would loan money against (and did).* If Desnick had made out a note, in the Hospital's favor, for $18.5 million, a court would not ignore it when toting up the Hospital's assets. The judge would discount the note to reflect the probability that it could be collected. The discount might be substantial, but the court would not value the note at zero. Yet that's what the bankruptcy court did: it valued contingent liabilities at 100¢ on the dollar and contingent assets at 0¢ on the dollar. The treatment must be symmetrical.

*Paloian v. LaSalle Bank, N.A.,* 619 F.3d 688, 693–94 (7th Cir.2010) (emphasis added). Just as Desnick's wealth "is not pie in the sky," neither is Sun's, who could easily pay, and just like Desnick, Sun ultimately paid Harris in full for the BCI loans.

Elson agreed that Harris could have sought payment from Sun any time, even without pursuing BCI first, and even without a default. He further agreed Sun could have easily paid the loan off. He admitted Harris would probably have pursued Sun for payment instead of BCI. *(Testimony of Elson, Trial Transcript, Vol. III at 155–164)* When asked at trial, Elson refused to agree that he had not considered the "Guaranty". *(Id. at 156)* However, a video clip of his deposition was unequivocal:

> Q. Did you consider the fact that there was these two alternate sources of repayment when you contemplated whether or not the $1.9 million debt rendered BCI insolvent?

A. No.

*(Id. at 157)*

After the deposition video clip, Elson acknowledged he did not factor in Sun's separate obligations to Harris. He insisted, however, it would not make a difference: "If a guarantor satisfied an obligation of the debtor, I would anticipate the guarantor would simply step into the shoes of the obligor. It doesn't make the debt go away." *(Testimony of Elson, Trial Transcript, Vol. III at 164)* Of course, this is a legal conclusion, and Elson is not an attorney. There are serious questions as to whether Sun could have stepped into the shoes of Harris if it had been challenged. First, if Sun was considered a direct, co-obligor to Harris, either through the broad terms of the "Guaranty" or some other theory such as alter ego, veil piercing, etc., it might well have been prohibited from stepping into the bank's shoes. *See, e.g., In re Flamingo 55, Inc.*, 378 B.R. 893 (Bankr.D.Nev.2007) (court denied subrogation to a party directly liable on an obligation).

The second reason that the $2 million Harris loan liability was incorrectly valued at one hundred percent was that if BCI was insolvent, it had a potential claim against Sun directors for improperly declaring a dividend. If Sun committed such a defalcation, § 510 of the Bankruptcy Code could have required subordination of Sun's subrogation claim to an equity level.

The section is applicable if Sun committed a defalcation, such as breaching fiduciary duties to creditors. *Matter of Lifschultz Fast Freight*, 132 F.3d 339 (7th Cir.1997); *In re Sentinel Mgmt. Group*, 689 F.3d 855 (7th Cir.2012). BCI directors (Sun executives) declared a dividend to Holdings on or about the sale date. The declaration was part of the sale closing documents and signed by the Sun executives Skillen and Calhoun. *(Bachrach Clothing, Inc. Consent in Lieu of a Special Meeting of the Board of Directors, February 15, 2005, JX 001 at 672–680)* The dividend from BCI to Holdings was the exact amount Holdings needed to pay off Sellers:

IV. Dividend Distribution

WHEREAS, Bachrach Clothing Holding Corp., a Delaware Corporation ("Holdings") is the sole shareholder of the Corporation.

WHEREAS, the Board deems it to be in the best interests of the Corporation to declare and distribute a dividend consisting of cash in the amount of $1,969,295.89 (the *"Dividend"*) to Holdings; ...

*(Id. at 675)*

 If BCI was insolvent, that dividend would constitute a breach of fiduciary duty under Illinois law. *See* 805 ILCS 5/8.65; 805 ILCS 5/9.10; *Wieboldt*, 94 B.R. at 510–11. BCI would have a claim against the Sun executives, which is a contingent asset that should have been valued.[45] Moreover, to the extent Sun is held

---

**45.** BCI argues in its post-trial brief that the Sun executives had a good faith defense to the unlawful dividend claim as they relied on BCI's balance sheet, which indicated substantial shareholder equity. BCI's attorneys are trying to do what Elson did not do: value the claim at zero by arguing one defense—good faith. The court is not obliged to try the whole contingent claim to figure out if BCI was insolvent. Elson should have stated an opinion about the value of that claim. The good faith defense does not wipe out an ability to offset the Harris liability anyway. This is because Sun was a co-obligor on the Harris loan. If Sun paid off Harris (which it in fact did) BCI could assert defenses to Sun's subrogation claim independent of the unlawful dividend. First, a co-obligor might not have any subrogation rights at all. *See In re Flamingo 55, Inc.*, 378 B.R. 893 (Bankr.D.Nev.2007). Second, while not appropriate to impose Sun's actions on the Bachrachs, it may have been appropriate to collapse all the entities Sun created to shield its wealthy funds from fraudulent transfer liability. If the LBO ren-

responsible for its employees' actions, § 510 could apply to subordinate the Harris loan subrogation claim that Elson indicated would arise if Harris pursued Sun instead of BCI on the $2 million loan.

Elson admitted he did not consider, much less add to BCI's assets, any claim or offset related to this dividend declaration, which would have been illegal if BCI was insolvent. He was not aware of the dividend declaration until informed at his deposition. *(Testimony of Elson, Trial Transcript, Vol. III at 170)* At his deposition, he acknowledged that Holdings owed and paid the $1,969,295.89 to Sellers and that this was the exact amount of the dividend declared by BCI to Holdings. *(Id. at 172)* At trial Elson tried to circumvent his failure to value the illegal dividend claim by refusing to admit a dividend was declared. He testified that in accounting records, the $1,969,295.89 was recorded as an intercompany loan from BCI to BCHC. *(Id. at 175)* Yet after a struggle during cross examination, he agreed that BCI borrowed money to pay a dividend to Holdings in the exact amount necessary to pay the Sellers the amount Holdings owed to them. *(Id. at 178)*

BCI also argues the intercompany loan recorded in its accounting records establishes that the dividend never occurred. They assert it was a loan instead. This accounting entry is not persuasive. First, Sun had a habit of changing the name of certain transactions, after the fact. The additional contribution that Woelcke invited the Bachrachs to participate in was initially termed an equity investment and later called a loan. The "Guaranty" of the Harris loan was really no more than a direct obligation by Sun to Harris. The

closing documents' flow of funds contained two versions: 1) how it was supposed to be under the SPA and 2) how it actually happened for purposes of expediency. Footnote 1 of the Closing Sequence and Flow of Funds Memo states how the $1,969,295.89 was to be paid to Sellers: "The indebtedness under this note will be repaid *by Buyer* with *distributions* from the Company to Buyer immediately after the Closing." *(JX 001 at 324,* emphasis added*)* This language is more consistent with a dividend distribution as opposed to a loan. The same use of the word "distribution" to buyer ("Holdings") is repeated in paragraph C. *(Id. at 328)* The word "loan" is not mentioned whatsoever in connection with BCI's distribution to Holdings. However, the word "loan" does appear for other transactions, where loans were contemplated and evidenced by notes. *See* for example, paragraph B(1)(d) discussing Seller's loan to Holdings. *(Id. at 327)* Part IV of the Flow of Funds Memo does not support Elson's testimony that Sellers were paid *directly by BCI* instead of Holdings. The preface to part IV states: "Notwithstanding the foregoing, the parties acknowledge that for the sake of efficiency and convenience and to expedite the closing of the transactions contemplated by this Memorandum, the following actual net transfers were made. . . ." The actual transfers include $2 million paid from Sun entities to Harris and various transfers from Harris to Sellers, Sun and professionals working on the acquisition. No payment out of BCI's bank account is shown as an actual transfer. *(Id. at 330–331)*

Moreover, Elson grudgingly acknowledged that all of the other intercompany

---

dered BCI insolvent, BCI had defenses to Sun's subrogation rights. The fact that BCI and the Committee decided to settle with Sun, and issue a covenant not to sue, does not remove the potential claims against Sun, pri-

or to that time, which could have blocked Sun's ability to step in Harris' shoes and assert a $2 million claim against BCI. Elson was incorrect to testify Sun could simply replace Harris.

loans involving BCI, Holdings and Sun were evidenced with notes. If the dividend was really an intercompany loan, it was the only one that was not evidenced with a note. *(Testimony of Elson, Trial Transcript, Vol. III at 198–199)* Finally, there is no reason to think that the dividend did not occur when every other event stated in the *Consent in Lieu of a Special Meeting of the Board of Directors, February 15, 2005,* which contained the declaration, happened. Given all this evidence, Elson should have considered and valued the illegal dividend claim as an asset of BCI or an offset to the $2 million Harris liability.

To summarize, even if Elson is correct that BCI only had a little over a million dollars in enterprise value, his insolvency opinion is unsound, because it valued contingent liabilities at 100%, but failed to offset BCI's contingent assets against those liabilities. Moreover, he agreed that BCI would be solvent if the $4 million subordinated debt and the Harris loans were removed from BCI's books. *(Testimony of Elson, Trial Transcript, Vol. III at 192–193)* A strong case exists for either removing those liabilities altogether, or discounting them substantially.

### 3. Discounted Cash Flow Method vs. The Real World

Elson's valuation was flawed because he failed to discount BCI's contingent liabilities before subtracting them from BCI's enterprise value. Additionally, he understated BCI's enterprise value, which lowered the asset side before his exaggerated liabilities were deducted. Defendants' expert, Ciancanelli, concluded that BCI's enterprise value was over six times higher than the value calculated by Elson.[46]

Both Elson and Ciancanelli used the "discounted cash flow" method ("DCF") to arrive at BCI's enterprise value. Under this approach, the value of a company is derived from the present value of expected cash flows, taking into account appropriate risk. *(Testimony of Elson, Trial Transcript, Vol. III at 25)* The cash flows are made up of two periods: the discrete period, which is usually projected cash flows over 4 or 5 years, and the terminal period, which starts after the discrete period and attempts to reflect the future cash flows of the company. These cash flows are summed and discounted to their present value.

Although both Elson and Ciancanelli used Sun's projections of BCI's cash flows, the disparity in their valuations is striking given that they relied on the same data as their starting point. It lends credibility to the concept that the DCF method is subject to manipulation and should be validated by other approaches. The disparate valuations in this case confirm the warning in *In re Iridium Operating LLC,* 373 B.R. 283 (Bankr.S.D.N.Y.2007):

> [T]he DCF "methodology has been subject to criticism for its flexibility; a skilled practitioner can come up with just about any value he wants." For this reason, it is important to validate conclusions reached using this methodology by comparing the results obtained when other accepted approaches to valuation are used.

*Id.* at 351 (quoting *To–Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.,* 953 F.Supp. 987, 996–997 (N.D.Ill.1997)).

---

**46.** In this discussion, enterprise valuations will be rounded up or down to an amount easier to refer to. Elson's actual positive enterprise value was $1,163,520.00 instead of the $1 million used in this section. Ciancanelli's discounted cash flow valuation amounted to a little over $6 million. His fair balance sheet test value of $8,827,440 will be rounded up to $9 million for easier reference.

Elson acknowledged this: "I would agree to the extent the inputs to discounted cash flow methodology are improperly specified...." *(Testimony of Elson, Trial Transcript, Vol. III at 120)* As they worked through their analysis, each expert generally selected parameters that pushed his valuation in the direction he wanted to go. Elson opted to plug in DCF components that shrunk BCI's value, and Ciancanelli selected parameters that enhanced BCI's value. The parties invested substantial resources and trial time criticizing opposing experts' choices. As mentioned earlier,[47] each expert was at times inconsistent, committing the "sin" in one point of the analysis for which he criticized the other. This made it more difficult to decide which expert was correct.

Nevertheless, Ciancanelli's explanations for his choices were better reasoned and his opinion of BCI's value was aligned with real world events or "contemporaneous market data." His DCF analysis produced a value of approximately $6 million in shareholder equity. This is consistent with the following market events:

- KPMG's due diligence revealed the $8 million purchase price was below book value;
- Sun, a sophisticated investor, believed the $8 million price was attractive;

- BCI's balance sheet, as audited by McGladrey and Pullen, and adjusted by Ciancanelli to conduct a Balance Sheet Fair Value Test, indicated shareholder equity of $8.8 million; [48]
- Harris' extension of a $7 million credit line to BCI at the time of sale;
- CPA and CFO Kristin Sowa's certification to LaSalle that BCI was solvent (Elson testified Sowa was the most knowledgeable about BCI's finances);
- LaSalle's extension of a $20 million credit line several weeks after the sale;
- Sun's additional investment of $5 million into BCI after the sale;
- CEO Arnold's interest in investing in the company after the sale occurred;
- Ed and Sun's agreement that BCI had at least $9 million in working capital six months after the sale; and
- No one, including Sun, a bank, an auditor, investment banker, or anyone else, ever indicated or complained that the Bachrachs' sale to Sun rendered BCI insolvent or undercapitalized.

Elson's opinion stands alone, contrary to Ciancanelli's, and wholly unsupported except for selected statistical tables in valuation treatises. However, those same treatises also support Ciancanelli.

---

**47.** *See* footnotes 39 and 41, *supra,* and 49.

**48.** Ciancanelli recognized that BCI's balance sheet could not be relied on without adjustments. This is because accounting rules require the auditor to squeeze the value of the assets into the purchase price. This results in artificial accounting entries. However, Ciancanelli used the balance sheet only as a starting point, correcting it for known market conditions. Ultimately, on a cumulative basis, the assets were adjusted $4.2 million *down* from the historic, book basis. He concluded that under this test, BCI had positive shareholder equity of $8.8 million, *(Testimony of Ciancanelli, Trial Transcript, Vol. 5 at 180–19; DX 106 at 16–21)* Elson dismissed the

analysis on the basis that the balance sheet reflected historical and not fair market values and that the equity did not precisely match up with Ciancanelli's DCF valuation. *(Elson Rebuttal Report DX 116 at 4)* Ciancanelli at least made the effort to validate his DCF conclusion. Elson did not. Ciancanelli addressed the historical entries by market value adjustments, which were conservative and shaved over $4 million off BCI's value. The Ciancanelli/Murphy Rebuttal Report criticized Elson for not attempting to validate his DCF conclusion with a cost approach. They noted that the Fair Balance Sheet Test was typically used to determine cost of assets. *(DX 105 at 6642, p. 3 of report)*

Elson testified that three areas of disagreement accounted for most of the disparity between their DCF valuations: (1) apportioning the cost of equity and debt, (2) the appropriate equity risk premium for arriving at the cost of equity, and (3) the correct size premium, also a component of the cost of equity. These differences relate to calculating the discount rate applied to a company's future cash flows to arrive at a valuation. This discount rate is commonly referred to as the Weighted Average Cost of Capital ("WACC"). The higher the WACC, the lower the valuation. Elson selected 19.5% and Ciancanelli chose 11%. WACC is generally computed from two components: the cost of equity (the return an investor would require) and the cost of debt after tax. Each component is weighted to reflect a company's capital structure.

### a. Elson Should Have Used BCI's Capital Structure to Apportion the Cost of Equity and Debt

The first area of disagreement was how to weigh or apportion the debt and equity components. Elson consulted a book to determine the average debt to equity ratios of companies in BCI's industry, while Ciancanelli used BCI's actual capital structure to apportion the debt and equity. BCI's debt was lower than most comparable companies, but Elson reasoned that the sale should be valued as to a hypothetical purchaser, so the average industry capital structure should have been used. (Testimony of Elson, Trial Transcript, Vol. III at 43–44; 56–57; Elson Rpt., DX 116 at 11). Elson did not back up this claim with any literature and his critique was not explained enough to make

sense. Ciancanelli and Murphy insisted that Elson was mistaken; he should have used BCI's actual capital structure instead of an industry standard. If he had, his discount rate would have collapsed from 19.5% to 12.3%, resulting in a higher valuation. (DX 105 at 6642, page 3 of Rebuttal Report) Based on what was presented to the court, Ciancanelli and Murphy have the better argument. Regardless of who purchases a business, a company with actual leverage of 90% has to be worth less than a company with no debt. Use of a company's specific capital structure is advocated in Contested Valuation in Corporate Bankruptcy: A Collier Monograph, ¶ 8.05[1] (Robert J. Stark et al. eds., 2011):

> Any comparative analysis should be considered together with a review of the company's *specific* and relative financial situation, including review of elements such as cash flow, collateral coverage, *debt to equity ratios....* Comparable market data can provide guidance, but should not be viewed as conclusive. Instead the practitioner should consider adjustments for any *unique circumstances associated with the subject company,* with a view toward capital structure optimization.
>
> (emphasis added)

Elson erred by plugging in the debt structure of comparable companies, as opposed to using BCI's actual capital structure, resulting in too high of a WACC.[49]

### b. Elson Overstated the Cost of Equity

The cost of equity component of the WACC is the source of two other chief disagreements. Both experts used the Capital Asset Pricing Model ("CAPM") to

---

49. Elson's use of industry figures here appears inconsistent with his criticism of Ciancanelli's "hybrid" use of industry data to estimate multiples of cash flows for the terminal value of BCI. The court recognizes that the calculations involve two different components of the DCF, but Elson never explains why his "hybrid" approach to capital structure is acceptable but Ciancanelli's use of industry standards to determine an exit multiple is not. Presumably, all the components are determined with a hypothetical purchaser in mind.

determine the cost of equity.[50] This method involves four parameters: (1) risk free rate (similar to the rate of return for a government bond); (2) equity risk premium (the excess return the stock market provides over a risk-free rate); (3) beta (volatility of the company's stock-does it match, exceed or lag market movements?) and (4) size premium (does an investor require more of a return because of a company's size?). The experts quarrel over the appropriate equity risk and size premiums.

### i. Elson Inflated the Equity Risk Premium

Both selected their equity risk premium from Ibbotson's Valuation Yearbook, a widely accepted annual publication of data to assist in valuation tasks.[51] Elson's number of 7.20% came from aggregating stock market data stretching back to 1926. Ciancanelli's number of 5.60% came from stock market data reaching back 50 years, a shorter period. *(DX 116 at 7266, Elson Rebuttal Report at 10)* Elson supported his argument that Ciancanelli did not go back far enough by referring to a comment in Ibbotson's, which noted that some analysts do not go back as far as 1926 based on their belief that the 1920's, 1930's and 1940's contain too many unusual events.

Ibbotson pointed out that all time periods, however, contain unusual events. *(Id. at 10)* Ciancanelli countered that the shorter period was more appropriate because of the recent international diversification of markets, which would lower equity risk in the more current environment. *(Testimony of Ciancanelli, Trial Transcript, Vol. V at 207)* Elson did not consider whether globalization could have changed the risk profile for a more modern market. *(Testimony of Elson, Trial Transcript, Vol. IV at 60–61)*

While Ibbotson's advocated a longer data set, Professor Aswath Damodaran, a valuation expert quoted by Elson and Ciancanelli, noted there are different schools of thought. In his treatise, Damodaran observed that half the users of the historical approach go back to 1926 while others use a shorter period.[52] In any event, he recommended a long-term historical equity premium of no higher than 5.5%. Elson acknowledged this but was not sure how Damodaran reached that number. *(Testimony of Elson, Trial Transcript, Vol. IV at 68–69)* However, Damodaran appeared to use data back to 1926 but calculated the market return as a geometric average instead of arithmetic average.[53]

**50.** Elson also used the "build-up" method which is a function of three risk components: equity, industry and size premiums. The approach that both experts used, CAPM, does not look to risk based on an industry code but uses companies comparable to BCI to compute the volatility of stocks (beta). Both methods seek to quantify the risk of investing in a particular type of security and the calculations are similar. *(Testimony of Elson, Trial Transcript, Vol. III at 53–55)* The disagreements are the same, regardless of the method used, so the court will refer to CAPM—the method used by both experts.

**51.** Elson used the 1994 edition of Ibbotson's and Ciancanelli consulted the 1995 edition. However, the parties agreed there was no significant difference between the two years.

**52.** Aswath Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, Chapter 7, Kindle Location 5062 (John Wiley & Sons, Inc., 3d ed. 2012).

**53.** Both Elson and Ciancanelli used the arithmetic mean data to arrive at the equity risk premium. Damodaran maintains the arithmetic mean will overstate the equity risk premium. Damodaran, *supra* note 52, at Loc. 5083. In the updated version of his treatise, it is fairly clear. Under the historical risk premium table stretching from 1928 to 2010, the arithmetic mean is 7.62% and the geometric mean is 5.67%. *Id.* at 5099, Table 7.3.

It is interesting that Damodaran is actually critical of the historical approach, whether a longer or shorter data set is consulted: "Given how widely the historical risk premium approach is used, it is surprising how flawed it is and how little attention these flaws have attracted." [54] He recommended an alternative method that did not depend on discretionary selection of a historical period: "There is an alternative to estimating risk premiums that does not require historical data ... but does assume the market, overall, is correctly priced." [55] He called this method an implied equity risk premium and advocated the use of 2.87% if you are market neutral or "if you have to value a company for an acquisition." *(Id. at 70, quoting* Aswath Damodaran, Damodaran On Valuation: Security Analysis for Investment and Corporate Finance 175 (2006)*)* As Ciancanelli stated, Damodaran's books generally recommend a historical equity risk premium of approximately 4.00%, which is lower than Ciancanelli's 5.6% and much lower than Elson's 7.20%. *(Testimony of Ciancanelli, Trial Transcript, Vol. 5 at 207–208)* Damodaran's current treatise explains why a rate near 4% is best if the historical approach is used instead of his suggested implied equity risk premium:

> While users of risk and return models may have developed a consensus that historical premium is, in fact, the best estimate of the risk premium looking forward, there are surprisingly large differences in the actual premiums we observe being used in practice. For instance, the risk premium estimated in the U.S. markets by different investment banks, consultants, and corporations range from 3 percent at the lower end to 12 percent at the upper end. Given that they almost all use the same database of historical returns, provided

by Ibbotson Associates, summarizing data from 1926, these differences may seem surprising. There are, however, three reasons for the divergence in risk premiums ...

> Consequently, the arithmetic average return is likely to overstate the premium.

> In summary, the risk premium estimates vary across users because of differences in time periods used, the choice of Treasury bills or bonds as the risk-free rate and the use of arithmetic averages as opposed to geometric averages.... *If forced to choose an equity risk premium on this table, we would be inclined to go with 4.31 percent, the geometric average risk premium for stocks over Treasury bonds from 1928 to 2010.*

Damodaran, *supra* note 52, at Loc. 5049, 5091, 5098 (emphasis added).

At a minimum, Elson overstated the equity risk premium by not selecting the data calculated as geometric averages. Both Elson and Ciancanelli used arithmetic mean data, and both overstated the equity risk premium as measured on a historical basis. Elson overstated it substantially more, however. Ciancanelli's equity risk premium is closer to the 4% historical figure recommended by Damodaran and more accurate than Elson's. Indeed, Damodaran's preferred approach is market neutral and less than three percent. Elson's is double that amount and just not realistic.

### ii. Elson Inflated the Size Premium

The third major topic of disagreement is the amount of risk premium included for the size of a company. Like the equity risk premium just discussed, the size premium is part of the cost of equity calcula-

---

**54.** Damodaran, *supra* note 52, at Loc. 5121. **55.** *Id.* at 5342.

tion needed to derive the discount rate or WACC. The concept here is that an investor may require more return to invest in a small company. The parties agree that their selected size premiums created the biggest difference between the two valuations. Both obtained their numbers from Ibbotson's. Elson selected 9.8% for the size premium while Ciancanelli used 4.02%. *(Testimony of Elson, Trial Transcript, Vol. IV at 25)* Ibbotson's reported size premiums in categories or deciles numbered 1 through 10, with 10 representing data from the smallest of companies. BCI's market capitalization fit into three categories: the "micro-cap" category (deciles 9 and 10), decile 10 or 10B. 10B was a subset of the tenth decile and reported data from the smallest of the small companies. *(Testimony of Elson, Trial Transcript, Vol. IV at 28–30)* Elson selected the size premium in the 10B category while Ciancanelli chose his number from the micro-cap. Ibbotson's cautioned: "Breaking the smallest decile down lowers the significance of the results compared to results for the 10th decile taken as a whole, however. The same holds true for comparing the 10th decile with a micro-cap aggregation of the 9th and 10th decile." *(Trial Transcript, Vol. IV at 31)* In other words, the data reported in the micro-cap category was more reliable because it contained a larger sample size of small companies.

Elson was concerned about a large sample size when he criticized Ciancanelli for looking back to only 50 years of stock market data, but he had no concern about it when selecting his size premium. His testimony was that he did not pay particular attention to Ibbotson's point that the 10B decile might be less reliable. Initially, he was not even certain what Ibbotson's meant by "statistical significance". *(Testimony of Elson, Trial Transcript, Vol. IV at 31–32)* He did admit that Ibbotson's was criticized for offering the 10B subdivision on the basis of its questionable reliability.

*(Id. at 33)* Nevertheless, Elson believed that BCI fit best in 10B because it was smaller than most of the companies in that sub-decile, and Ibbotson's did indicate the results in 10B were statistically reliable—just not as much as the micro-cap. *(Id. at 35)* If Elson had selected the size premium from the larger data sample found in the micro-cap, it would have been 4.01%—less than half of what he selected and it would have increased his calculation of BCI's enterprise value. *(Id. at 37–38)* On cross examination the following exchange occurred between Elson and counsel:

Q. Of the three available deciles, you chose to use data from the decile that would produce the least significant result but also result in the highest-sized premium, right?

A. Yes, because I felt it was appropriate and justified.

Q. There's nothing in Ibbotson's yearbook that says it would be inappropriate to use the micro-cap decile to establish a size premium for the company the size of the debtor, is there?

A. I'm not aware of an explicit statement that says you can't do that . . . to answer your question specifically, I'm not aware of anything in this book that says you cannot use the micro-cap for purposes of valuing a company the size of BCI, I concur.

*(Id. at 39–40)*

Elson acknowledged that size premium can vary from industry to industry and Ibbotson's found that smaller apparel and accessory stores like BCI actually performed *better* than their larger store counterparts. Elson did not use this information to inform him as to what size premium to select. *(Id. at 40–44)* Ciancanelli did, however. Although industry-specific size phenomena should not be used as a substitute for the size premium, Ciancanelli properly took note of the industry result to

inform his decision to select more reliable premium from the microcap decile. *(Testimony of Ciancanelli, Trial Transcript, Vol. VI at 42)* Ciancanelli's size premium of 4.2% also coincides with Professor Damodaran's recommendation of 4%: "Since small cap stocks have earned about 4 percent more than large cap stocks over the past few decades, you could consider this a reasonable estimate for the small firm premium." [56] Elson's choice of over double that amount is not reasonable.

Combining Elson's overstated components of the cost of equity, he arrived at a 19.5% weighted average cost of capital compared to Ciancanelli/Murphy's 11%. Ciancanelli, who studied companies similar to BCI to arrive at a terminal value for his DCF, testified that no company sold anywhere near the price inferred from Elson's WACC. *(Id. at 74)*

### c. Terminal Value

Terminal value is the value of the company at the end of the discrete projection period. *(Testimony of Ciancanelli, Trial Transcript, Vol. V at 197)* The DCF method values a company by discounting the cash flows of the discrete projection period and the terminal period by the WACC. Most of a company's enterprise value usually comes from the terminal period. Elson calculated the terminal value by applying a growth rate of 3% to projections under the Gordon Growth Method. Ciancanelli/Murphy calculated the terminal value by using an exit multiple of the ratio of enterprise value over EBITDA. The literature indicates that both approaches are commonly used. *Contested Valuation in Corporate Bankruptcy: A Collier Monograph,* ¶ 8.04 (Robert J. Stark et al. eds., 2011)

However, Elson referred to Ciancanelli's use of exit multiples as a "hybrid" approach that has been criticized. He cites Professor Damodaran's treatise warning that the use of multiples to calculate terminal value in a DCF results in a "dangerous mix of relative and discounted cash flow valuation." *(Elson Rebuttal Report, p. 6 at DX 116, p. 7262)* This suggests that Ciancanelli's exit multiple approach was error *per se.* However, the full context of Damodaran's comments does not support that charge. First, Damodaran recognizes the use of exit multiples as one of three ways to arrive at a terminal value. Damodaran, *supra* note 52, at Loc. 6462. He notes: "Many analysts estimate the terminal value using a multiple of earnings or revenues in the final estimation year." Damodaran prefers the stable growth method "... if you assume that firms have infinite lives." *Id.* at Loc. 10048. He feels that a stable growth approach would yield more consistent results, but both the exit multiple and stable growth methods could be used. He also acknowledges that both stable growth and exit multiple calculations can be manipulated: "We concede that terminal value is manipulated often and easily, but it is because analysts either use multiples to get these values or because they violate one or both of two basic propositions in the stable growth model." *Id.* Indeed, Damodaran acknowledges that Ciancanelli's Enterprise Value to EBITDA ratio was the most widely used multiple method and his book devoted several pages to it. *Id.* at Loc. 15342. Damodaran also discusses the problem of using the stable growth method when a company has not yet reached its stable growth at the end of the discrete period. He recommends a two or three step approach over the Gordon Growth model. *Id.* at Loc. 27649. The point is that both exit multiples and the stable growth approaches are commonly employed to arrive at terminal

---

**56.** Damodaran, *supra* note 52, at Loc. 6462.

value for the DCF method, and both can be misused.

Ciancanelli's use of comparable companies to determine an exit multiple was more convincing than Elson's application of the Gordon Growth Model. Ciancanelli valued BCI's terminal period at 6.5 times Sun's projected EBITDA.[57] His 6.5 multiple was derived by reviewing the performance and sales of similar, actual companies instead of consulting a book.[58]

BCI's counsel tried in vain to discredit the calculation of Ciancanelli's exit multiple on the basis that the comparable companies had higher revenue and better EBITDA margins[59] than BCI, believing that undercut his ability to use them. However, Ciancanelli deftly explained that BCI's lower margin of 3% actually suggested that the exit multiple of 6.5, derived from the companies with higher margins, was reasonable and conservative. This is because 6.5 times BCI's lower margin would yield a lower terminal value. In reality, the multiple for a company with a very low EBITDA margin would probably be much higher than 6.5 because there would be more room for growth. Today's Man, a men's clothing retailer with a lower EBITDA margin than BCI, proved that point; its reported multiple was 86. *(Testimony of Ciancanelli, Trial Transcript, Vol. V at 302–318)* Moreover, the 6.5 exit multiple was in the lower quartile of comparable public companies and none of the

sales involved a multiple lower than that. *(Id. at 202)*

Elson attempted to discredit Ciancanelli's terminal valuation by using his exit multiple calculation to "back solve" for an implied growth rate. He reported that the implied growth rate would be 6.9%, twice the growth rate of the economy. *(Elson Rebuttal Rpt., DX 116, at 7259, p. 3, 7; Testimony of Elson, Trial Transcript III, p. 101)* However, when management fees were removed from his attempt to imply a high growth rate, the implied growth rate was reduced to 5.5%. A GDP of 3.5% plus inflation of 2 % would approximate the implied rate of 5.5%. So, once management fees were removed, as they should be, Elson's back testing actually confirmed the reasonableness of Ciancanelli's WACC. *(Testimony of Ciancanelli, Trial Transcript, Vol. V at 219–220; Vol. VI at 328)* In contrast, the 3% growth rate from Elson's application of the Gordon Growth Model implies that BCI's future performance, notwithstanding Sun's purchase of BCI at an "attractive" price, would lag the economy. *(Trial Transcript, Vol. VI at 72)* Again, real world information about the performance and sales of companies similar to BCI informed Ciancanelli's valuation of the terminal period. Elson continued his approach of shuffling numbers in and out of formulas to get where he needed to go.

Elson's failure to discount BCI's contingent liabilities and his exaggerated WACC

---

**57.** A 6.5 multiple is fairly modest in view of current data presented in Damodaran's treatise: "Figure 18.14 summarizes the enterprise value to EBITDA multiples for U.S. firms in January 2011 ... The average EV/EBITDA multiple across U.S. firms in January 2011 was 54.8, while the median value is closer to 10." Damodaran, *supra* note 52, at Loc. 15251.

**58.** Jos A. Bank, Men's Warehouse, S & K Famous Brands, Casual Male Retail Group,

Harold's Stores, and Dillards were companies used to study growth performance. He also looked at the purchase price of companies sold: Tommy Bahama Group, Maurice's Incorporated, Hat World Corporation, Loehmann's Holdings, White House, Inc. and Today's Man, Inc.

**59.** EBITDA divided by Revenue permits direct comparisons of company performance.

both doom his conclusion that BCI was insolvent or rendered insolvent. Sellers were not required to prove that BCI was solvent, but they did so with Ciancanelli/Murphy's analysis. BCI was neither insolvent nor rendered insolvent as a result of the sale/LBO on February 15, 2005.

### 4. The Sale/LBO did not Leave BCI with Unreasonably Small Capital or Unable to Pay its Debts

■ Before Sun, BCI had no long-term debt. It ran on cash from operations. During due diligence, Sun executives scrutinized BCI's working capital and what would be needed after the sale. Jason Leach, who arranged the financing for the acquisition, was comfortable with the capitalization to be provided by BCI's financing. *(Leach 2004 Exam Tr. at 111)* Bachrach CFO and CPA Sowa and Sun executive and accountant Woelcke both believed the transaction left BCI with adequate capital. The Sellers agreed to return enough of the purchase price to insure that BCI had working capital in excess of $10 million even though it could run easily on $9 million. Sun's projections were accepted and relied on by banks providing substantial credit. Harris extended BCI a $7 million credit line and LaSalle replaced that with a $20 million line.

BCI produced no witness, other than its paid expert Elson, who blamed BCI's liquidity problems on the sale transaction. Elson insisted that BCI had so much excess inventory packed away at the date of the sale, it was foreseeable a huge markdown would immediately occur, resulting in an availability block and drying up BCI's credit. He substantiated his theory with Sheila Arnold's deposition and the fact that it actually happened. *(Testimony of Elson, Trial Transcript, Vol. III at 71–76, 113; Vol. IV at 18–23)* Elson's hindsight analysis is not acceptable. "When one fails, it is easy enough to find an expert who will opine that it was certain to fail from the very start. Such facile proof should rarely be accepted...." *Baldi*, 548 F.3d at 582.

Elson himself admitted that unless it was foreseeable, his hindsight was inappropriate. His report relied almost entirely on Sheila Arnold's deposition to establish foreseeability. He quoted some Sun employees to the same effect, but their depositions were clear that they were just repeating what Arnold told them. They were not present to view the inventory or make any decisions. When Arnold took the massive $8 million markdown, Elson's report tried to couch the decision as a group one with no dissent:

> She testified that the strategy was based upon the analysis she and her merchandising team undertook involving the assessment of historical data on "quantity" and "sell through levels." In addition she clearly acknowledged that it was not just her own idea, and that there was no "push back" against the strategy from anyone at BCI.

*(Elson Report at 9, DX 117 at 7297)*

In reality, there was no evidence to show that this was a foreseeable event and supported by everyone. Sun executives testified they left such decisions up to Arnold—she was the CEO. William Lee, the only witness to testify about BCI's inventory who had firsthand knowledge, stated that there was nothing unusual about the inventory and nothing required Arnold to take a massive markdown all at once. Neither Elson, Arnold, nor Sun employees had any men's retail experience or any qualifications to opine on the inventory status of BCI. As Lee said, Arnold did not even know what side vents were in a suit jacket.

A complete review of Arnold's deposition and her management reports to Sun reflects she wanted to change the look of clothing sold by BCI. She intended to

brand BCI differently, so she decided to get rid of much that was purchased by someone else with different taste. The fact that none of her subordinates "pushed back" is of no surprise. They had just witnessed her showing two senior managers the door. Arnold's personal taste in clothes was not foreseeable. Arnold herself said she ran her decision by Sun personnel, because she knew her markdown would have a substantial effect on the business. Her need to get permission, when Sun left the operating decisions up to her, reflects what a big step she thought it was. The huge markdown was not in the planning or foreseeable.

This is not to say that BCI's inventory was perfect. Sun's due diligence identified merchandising weaknesses and accounted for that in their projections. Ed Bachrach recommended replacing the current merchandising manager, and Ed also wanted to move on. Sun believed that current management was detached from BCI. They projected that new, involved executives would improve inventory management and permit BCI to grow profitably. It was not foreseeable that new management would perform so poorly. Yet, Elson's report reads like an apology for Sheila Arnold. He tries to spin a story that she was burdened with a mountain of obsolete menswear that had to be sold instantly, no matter how it affected BCI's borrowing base. However, her testimony that she did not pay attention to BCI's borrowing availability is surprising and certainly not foreseeable. The court will not spend any further time going through Elson's report point by point. Suffice it to say, it was one-sided.

The accepted test for determining unreasonably small capital is reasonable foreseeability. *Moody v. Security Pacific Business, Inc.*, 971 F.2d 1056 (3rd Cir. 1992) is particularly instructive in this case:

Therefore, we hold the test for unreasonably small capital is reasonable foreseeability. Under this analysis, it was proper for the district court to consider availability of credit in determining whether Jeannette was left with an unreasonably small capital. The critical question is whether the parties' projections were reasonable.

*Id.* at 1073.

Both Elson and Ciancanelli used Sun's projections for their valuations. Elson admitted Sun's projections appropriately identified the risks of buying BCI. *(Testimony of Elson, Trial Transcript, Vol. III at 123)* He also admitted they were reasonable. *(Id.)* The projections predicted sufficient working capital to meet BCI's obligations. Moreover, two banks were ready to lend millions, plus Sun had the financial strength to contribute capital and did. Both elements of the test for sufficient capital were met. That should really end it.

Nevertheless, Ciancanelli/Murphy also studied the debt equity ratios of comparable companies. BCI's equity made up 76% of its total capital. *(DX 106 at 30)* Comparable companies averaged around 64% of equity with a range from 25% to 95%. *(Id.)* Ciancanelli concluded that BCI not only fit within that range, it was above average. Also, Sun projected the equity to rise to 83.9% by 2009. *(Id.* at 30) Ciancanelli also recognized the "deep financial resources" of Sun. *(Id. at 31)* Elson dismissed that in a footnote, stating there was no reasonable basis to believe Sun would invest or assume any of BCI's debt unless it was bound by contract. *(DX 116 at 7273, Elson Rebuttal, p. 17, ftn. 51)* Sun's legal obligation is not much of a rebuttal, since very few capital providers, including banks, are required to invest. Although not "contractually bound" to do so, Sun did step in and provide more capital. It pur-

chased the Harris $2 million loan to BCI and provided BCI with $3 million additional funds. Sun could have invested more. Arnold certainly thought Sun gave up too soon, even though serious mistakes were made under her leadership. None of this would have been foreseeable to the Bachrachs when they sold their company, free of debt, to Sun in February 2005.

BCI spent a substantial amount of time attempting to prove that it was in serious trouble before the sale. However, what happened before the acquisition is not relevant since the test is whether Sun's projections were reasonable. *In re McCook Metals, L.L.C.*, 2007 WL 4287507, *13 (N.D.Ill.2007). Elson admitted they were. Moreover, although BCI's performance was flat for a few years before the sale, no evidence suggested that the Bachrachs were motivated to sell for reasons of poor financial performance. BCI had substantial cash reserves and no debt. Ed wanted to move on in his life. Sun's due diligence report observed Ed's detachment and projected that a fully engaged manager could add value to BCI. It did not turn out that way. A company that had survived generations could not survive Sun.

## Conclusion

Sun's debt transactions will not be collapsed and treated as a part of the Bachrachs' sale to Sun. Accordingly, judgment is entered in favor of Defendants on all fraudulent transfer counts (1–12). Since the only facts alleged to support the breach of fiduciary count were related to insolvency and undercapitalization, judgment is entered in favor of Defendants on Count 13. As Sellers withdrew their claims, Counts 14 and 15 are moot as to them and there is no basis to subordinate the claim of Barsaled.